William R. McCORKLE and Jeanne D. McCorkle, Appellees,

v.

The FIRST PENNSYLVANIA BANKING AND TRUST COMPANY, Appellant.

No. 71–1157.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 29, 1971.

Decided April 20, 1972.

---

John C. Cooper, III, Baltimore, Md. (James N. Vaughn, Ellicott City, Md., on the brief), for appellant.

Malcolm B. Kane, Columbia, Md., for appellees.

Before SOBELOFF, Senior Circuit Judge, and CRAVEN and FIELD, Circuit Judges.

SOBELOFF, Senior Circuit Judge:

We face here an unhappy predicament: The law and the equities appear certain, yet we may not decide the case on its merits because of a technical jurisdictional deficiency. Although the appellant raised the jurisdictional question for the first time at the appellate level, we reluctantly accept its contentions. The judgment of the District Court, 321 F. Supp. 149, must be vacated and the case dismissed for lack of subject-matter jurisdiction.[1]

1. It has often been held that federal courts must be alert to avoid overstepping their limited grants of jurisdiction. At any stage of a litigation, including the appellate, subject-matter jurisdiction may be questioned. By failing to do so, the parties cannot confer jurisdiction by consent. If the court perceives the de-

## I. Facts

There is no contest concerning the facts. In October 1966, Patrick Murphy, a resident of Harford County, Maryland, purchased the yacht "Safari" from Northeast Yacht Sales, Inc., executing, at that time, an installment sales contract which reserved to the seller title to the yacht and a security interest therein. In a simultaneous transaction, the vendor assigned the contract to the present appellant, The First Pennsylvania Banking and Trust Company ["Bank"], a Pennsylvania corporation. The Bank then filed, in the county of Murphy's residence, an appropriate financing statement under the Maryland Uniform Commercial Code to perfect its security interest in the yacht. Md.Code Ann. Art. 95B, § 9–301(1) (b).

Fifteen months later, without the Bank's knowledge, Murphy enrolled the Safari as a "vessel of the United States" in accordance with 46 U.S.C. §§ 11, 103; 46 C.F.R. Part 67. As proof that he held clear title, Murphy exhibited the yacht's Master Carpenter's Certificate, which the seller had delivered to him. However, he concealed the Bank's ownership of the yacht and its outstanding security interest. Nine months after the Safari's enrollment, still without disclosing the Bank's interest, Murphy sold the yacht to Mr. and Mrs. McCorkle, here the appellees, for cash. Before consummating the purchase, Mr. McCorkle, a resident of Pennsylvania, noted the official registry number displayed on the yacht and realized the vessel was federally registered. He thereupon examined the yacht's Abstract of Title, kept in the Customs House at Baltimore, to verify whether Murphy was the outright owner of the Safari and the yacht subject to no liens. No outstanding liens were listed in the federal registry papers and there was nothing to alert the buyers to the existence of the Bank's security interest in the vessel, represented by the financing statement filed in Harford County, Maryland, under Maryland's Uniform Commercial Code. Consequently, the McCorkles relied solely on the federal enrollment records and did not search for or uncover the financing statement.

Shortly after the sale, Murphy left the country and took up residence in Panama. He defaulted on the installment sales contract and soon thereafter died, leaving an insignificant estate. The Bank, after tracing ownership of the yacht to appellees, looked to them for payment of the unpaid balance of the yacht's purchase price. Appellees, taking the position that they had done all that could reasonably be expected of them to discover the Maryland lien, denied liability to the Bank. In short, they maintained that Murphy's federal enrollment of the Safari, without giving the Collector of Customs notice of the Bank's security interest, cut off the prior state lien as to them.[2]

fect, it is obligated to raise the issue sua sponte. Louisville & Nashville Ry. Co. v. Mottley, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297 (1911); Woodward v. D. H. Overmeyer Co., 428 F.2d 880 (2nd Cir.), cert. denied, 400 U.S. 993, 91 S.Ct. 460, 27 L.Ed.2d 441 (1970).

2. In so arguing, appellees rely on 46 U.S.C. § 921, which states:
    (a) No sale, conveyance, or mortgage which, *at the time such sale, conveyance, or mortgage is made, includes a vessel of the United States* * * * shall be valid, in respect to such vessel * * * until such bill of sale, conveyance, or mortgage is recorded in the office of the collector of customs of the port of documentation of such vessel * * *. (Emphasis added.)
Reliance upon section 921 is misplaced here because, at the time the mortgage at issue was made, the Safari was not a vessel of the United States. More accurately, on the merits of their case, appellees may look to 46 U.S.C. § 1012, in which the italicized limitation in section 921 is omitted:
    No * * * mortgage * * * which includes a vessel of the United States or any portion thereof shall be valid in respect to such vessel * * * until such * * * mortgage * * * is recorded in the office of the collector of customs at the home port of such vessel * * *. 46 U.S.C. § 1012.

Appellees brought an action in federal district court at Baltimore for a declaratory judgment adjudicating title to the yacht and determining whether the Bank's interest survived. Apart from the Bank's observing, correctly, in the District Court that there was no diversity as between the parties, no jurisdictional issue was raised below. The court was of the opinion that it could act under "general admiralty jurisdiction * * in the light of the Ship Mortgage Act of 1920." It then proceeded to grant summary judgment for the McCorkles, holding that the Bank's failure to record its security interest in the federal registry in Baltimore cut off its state lien as against subsequent good faith purchasers of the yacht—here the appellees McCorkle. In their brief, appellees advance three alternative theories to sustain jurisdiction: (1) that all questions as to the ownership of a "vessel of the United States" are cognizable in admiralty in light of the Ship Mortgage Act of 1920, 46 U.S.C. § 911 *et seq.* ; (2) that the case is one coming under general federal admiralty and maritime jurisdiction, *see* 28 U.S.C. § 1333; and (3) that it is one arising under "the laws of the United States, to wit: The Ship Mortgage Act of 1920," *see* 28 U.S.C. § 1331(a).

We shall examine these theories in the following sections.

## II. *Admiralty Jurisdiction*

■ Appellees' first two jurisdictional theories suffer from related weaknesses and we will consider them together. It is argued first that, since there is provision in the Ship Mortgage Act and related statutes, *see* 46 U.S.C. § 11, *et seq.*, for federal registration, or enrollment, of certain vessels, those Acts have "federalized" all questions of title

pertaining to federally-enrolled ships and thereby have extended admiralty jurisdiction to encompass any case presenting such a question. The short answer to this contention is that the Supreme Court has expressly considered and unanimously rejected it:

> [In providing for the enrollment of vessels,] Congress has not undertaken to regulate contracts for conditional sales of vessels * * *. It has not entered the field * * *. There is no foundation for the contention earnestly urged by plaintiff in error that Congress by these acts created "a new form of property known as vessels of the United States" or that enrolled vessels are "nationalized or federalized" in respect of conditional sale contracts such as the one here involved. The enrollment of such vessels is not inconsistent with the application of the state law.

James Stewart & Co. v. Rivara, 274 U.S. 614, 618, 47 S.Ct. 718, 720, 71 L.Ed. 1234 (1927).

In light of *Rivara*, appellees' first jurisdictional submission must fail. We therefore turn to appellees' second theory: that the Ship Mortgage Act has operated to enlarge general admiralty jurisdiction to embrace all actions which bring into question maritime mortgages.

■ The general admiralty jurisdiction of the federal courts finds its roots in Art. III, § 2 of the Constitution: "The judicial Power [of the United States] shall extend * * * to all Cases of admiralty and maritime Jurisdiction; * * *." *See*, 28 U.S.C. § 1333(1). In applying this somewhat imprecise language to cases which involve contracts, as does the instant case, courts have always looked to the subject matter of the

---

Significantly, 46 U.S.C. § 1014 provides that, to the extent section 921 conflicts with section 1012, the former is deemed amended to conform with the latter. That section 1012 operates, upon federal enrollment of a vessel, to nullify prior state liens not then recorded, has been established in several cases. E. g., In re Penglase Sand Gravel Co., 76 F.2d 593, 596 (7th Cir. 1935); Atlas Imperial Diesel Engine Co. v. Criscuolo, 32 Cal. App.2d 244, 89 P.2d 674, cert. denied Criscuola v. Sweins, 308 U.S. 620, 60 S.Ct. 295, 84 L.Ed. 517, reh. denied, 308 U.S. 639, 60 S.Ct. 382, 84 L.Ed. 531 (1939).

contract to determine whether admiralty jurisdiction attaches, Grant Smith-Porter Ship Co. v. Rohde, 257 U.S. 469, 476, 42 S.Ct. 157, 66 L.Ed. 321 (1922). If the contract's subject matter is "maritime in nature," there is jurisdiction. North Pacific S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co., 249 U.S. 119, 39 S.Ct. 221, 63 L.Ed. 510 (1919); N. J. Steam Navigation Co. v. Merchant's Bank of Boston, 6 How. 344, 47 U.S. 344, 392, 12 L.Ed. 465 (1848); Weinstein v. Eastern Airlines, Inc., 316 F.2d 758 (3rd Cir.), cert. denied, 375 U.S. 940, 84 S.Ct. 343, 11 L.Ed.2d 271 (1963).

Oddly, an unchallenged line of cases decided prior to the Ship Mortgage Act of 1920, in applying this standard, held all mortgages on ships to be "non-maritime" in nature and thus unenforceable in admiralty. The J. E. Rumbell, 148 U.S. 1, 15, 13 S.Ct. 498, 37 L.Ed. 345 (1893); Bogart v. The Steamboat John Jay, 17 How. 399, 58 U.S. 399, 401–402, 15 L.Ed. 95 (1854).[3]

This preclusion of all ship mortgages from admiralty was eased in 1920 when Congress passed the Ship Mortgage Act. In an effort to make investment in ship mortgages more attractive, the Act accords priority to mortgages given on vessels of the United States, as against most other liens, upon compliance with certain filing requirements. 46 U.S.C. § 922(a), (b), (c), and (d).[4] Upon meeting these filing requirements, the mortgages become known as "preferred mortgages." 46 U.S.C. § 922(b). The Act further provides:

> Upon the default of any term or condition of [the preferred mortgage], such lien may be enforced by the mortgagee by suit in rem in admiralty. *Original jurisdiction of all such suits is granted to the district courts of the United States exclusively.* 46 U.S.C. § 951. (Emphasis added.)

■ Seeking to bring themselves within this explicit congressional expansion of admiralty jurisdiction, appellees argue that "the passage by Congress of the Ship Mortgage Act of 1920 sufficiently expanded the admiralty jurisdiction to encompass any legal questions arising under the Act." Once again we must disagree with appellees' contention. In upholding the constitutionality of the Ship Mortgage Act, the Supreme Court explained that the above-quoted section 951 was a valid exercise of congressional power to "alter or supplement the maritime law * * * and thus to extend the admiralty jurisdiction, 'as experience or changing conditions might require.'" Detroit Trust Co. v. The Barlum, 293 U.S. 21, 48, 55 S.Ct. 31, 40, 79 L.Ed. 176 (1934) (Hughes, C. J.).[5] However, the

---

3. In Bogart v. The Steamboat John Jay, 58 U.S. 399, 401–402, 15 L.Ed. 95 (1854), Justice Wayne explained the reasons for the rule as follows:

> It has been repeatedly decided in the admiralty and common law courts in England, that the former have no jurisdiction in questions of property between a mortgagee and the owner.
>
> \* \* \* \* \*
>
> [T]he mere mortgage of a ship, other than of an hypothecated bottomry, is a contract without any of the characteristics or attendants of a maritime loan, and is entered into by the parties to it, without reference to navigation or perils of the sea. * * * Such a mortgage has nothing in it analogous to those contracts which are the subjects of admiralty jurisdiction. In such a case, the ship is the object of the accomplishment of the contract, without any reference to the use of her for such a purpose. There cannot be, then, anything maritime in it.

4. Among other requirements, the mortgage must be filed with the collector of customs at the home port of the vessel, § 922(d) and an affidavit must be filed that the mortgage was made in good faith, with no intent to hinder or defraud creditors, § 922(a)(3). To qualify for priority of treatment, the mortgage must also, "at the time it is made," include all or part of a "vessel of the United States." Section 922(a). There is no claim that the Bank's interest meets the statute's requirements.

5. In upholding the congressional inclusion of preferred mortgages within admiralty, the Court rejected, with the following language, the reasoning used 80 years earlier

Chief Justice took pains to observe that the Ship Mortgage Act had not brought all ship mortgages within the admiralty jurisdiction:

> The grant is thus one of exclusive jurisdiction to enforce the lien of a "preferred mortgage." If the mortgage is a preferred mortgage within the definition of the Act, jurisdiction is granted; otherwise not. 293 U.S. at 33, 55 S.Ct. at 33.

Although it is dictum, the rule in *Detroit Trust, supra*, that non-preferred ship mortgages cannot be enforced in admiralty has gained wide acceptance in the lower courts.[6]

▇▇ Thus, notwithstanding the 1920 extension of admiralty jurisdiction to *preferred* maritime mortgages, courts continue to recognize the vitality of the pre-1920 rule with respect to *non-preferred* ship mortgages. Since the Bank's interest in the Safari is admittedly not "preferred" under the Ship Mortgage Act, the pre-1920 rule, treating such interests as outside admiralty jurisdiction, is dispositive.

Although the courts have not deviated from the *Detroit Trust* rule, it has not escaped scholarly criticism. Professor James W. Moore sharply denounces as "anachronistic" the distinction drawn in *Detroit Trust* between preferred and non-preferred mortgages and concludes

that the rule "cannot be supported by history or reason." 7a Moore, Federal Practice ¶ .285[1] at 3233–37. He argues persuasively that the pre-1920 general exclusion of ship mortgages from admiralty was merely an uncritical adoption of the English law as it existed in 1776. Since the jurisdiction of American admiralty courts has always been recognized to depend on the nature of the case and not the peculiarly limited rules of English law, Insurance Co. v. Dunham, 11 Wall. 1, 20 L.Ed. 90, 78 U.S. 1 (1870); N. J. Steam Navigation Co. v. Merchant's Bank, 6 How. 344, 47 U.S. 344, 12 L.Ed. 465 (1848), Professor Moore maintains that the Supreme Court's unreasoned adoption of the English approach and its continuing adherence thereto is unwarranted. Rather, he insists, the proper approach is to inquire whether ship mortgages are "maritime in nature" from the point of view of the "general maritime law of nations as adopted or modified by the Supreme Court or Congress." 7a Moore, *supra* at 3234.

Moore argues that the English rule in the Eighteenth Century was based not upon logic or maritime principles, but was instead Parliament's political solution to jealousies existing between the English law courts and the English admiralty. *See* DeLovio v. Boit, 7 Fed.Cas. No. 3,776 at 442–443 (C.C.D.Mass.1815) (Story, J.). Significantly, Moore notes

---

in Bogart v. The Steamboat John Jay, *supra*, note 3:

> The fact that mortgages on ships had not been considered to be maritime contracts was not conclusive as to the constitutional authority of the Congress to alter or supplement the maritime law in this respect * * *. The ship, documented under the laws of the United States, is the instrumentality of our maritime policy * * *. The existence of the ship, the investments which make that existence possible, is the necessary postulate of maritime liens. We cannot fail to regard the encouragement of investments "in shipping and shipping securities"—the objective of the Ship Mortgage Act—as an essential prerogative of the Congress in the exercise of its wide discretion as to the appropriate development

of the maritime law of the country. The regulation of priorities of ship mortgages in relation to other liens, and the conferring of jurisdiction in admiralty in order to enforce this regulation, are appropriate means to that legitimate end. 293 U.S. at 48, 55 S.Ct. at 40.

6. *E. g.*, Tropicana Shipping S. A. v. Empresa Nationale "Elcano" de la Marina Merchante, 366 F.2d 729 (5 Cir. 1966); North American Continental Co. v. The El Cuis, 107 F.Supp. 436 (E.D.N.Y. 1952); Hirsch v. The San Pablo, 81 F. Supp. 292 (D.Fla.1949); Commercial Banking Corp. v. One Approx. 30 Foot Motor Boat, 86 F.Supp. 618 (D.N.J. 1949). *See also* Gilmore & Black, Law of Admiralty, § 9–52 (1957); 1 Benedict, Admiralty, § 77 (6 ed. 1940).

that at one time, before the American revolution, the English admiralty courts did take cognizance of ship mortgages; later, Parliament removed that jurisdiction from admiralty. More recently, Parliament has reversed itself, once again restoring to the admiralty courts the power to enforce ship mortgages. Bogart v. The Steamboat John Jay, 17 How. 399, 58 U.S. 399, 402, 15 L.Ed. 95 (1854). Ironically, our federal courts still feel the effects of the now discarded limitation. In the final analysis, argues Moore:

> What is controlling is simply whether marine mortgages are contracts which further and are inseparably intertwined with maritime commerce and navigation. * * * That such contracts are maritime in nature is at least prima facie established by virtue of the fact that Congress has enacted the Ship Mortgage Act of 1920 and the constitutionality of that act has been upheld. If ordinary marine mortgages are not maritime in nature, it would be beyond the power vested in Congress by the Constitution to pass legislation making certain of such mortgages maritime. To say in one breath that ordinary marine mortgages are not maritime in nature because not concerned with maritime navigation and commerce while, in the next, sanctioning the enactment of legislation to make certain other of such mortgages enforceable within the admiralty "in order to promote investment in shipping securities and *thus to advance maritime interests of the United States*" is incongruous. Either all mortgages on vessels engaged in maritime commerce, or their gear, aid and abet such undertakings or none do. 7a Moore at 3234–35. (Emphasis in original.)

Thus far, Moore's argument remains unrebutted. No case has been found which critically analyzes the unsupported dictum in *Detroit Trust* and no persuasive reasons have been brought to light for distinguishing on constitutional grounds between preferred and non-preferred ship mortgages.

■ In another situation we might feel at liberty to reevaluate the continuing soundness of this admiralty jurisdiction rule, weakly supported as it is, in light of modern circumstances. However, in view of the unequivocal statement of the rule by the Supreme Court, as well as the absence of any intervening developments indicating a weakening of the rule, we feel bound by *Detroit Trust* and its progeny in the lower courts. It would be sheer presumption for an inferior tribunal to undertake to overrule an explicit decision of the Supreme Court, from which the Court has given no hint of departing, no matter what may be thought of the wisdom of that decision. It is the function of the Supreme Court to correct our errors; it is not our function to rectify what we may consider mistakes of the Supreme Court. If the rule embracing preferred ship mortgages within admiralty jurisdiction while excluding non-preferred ship mortgages is to be abandoned, it is for the Supreme Court or Congress to do so, not the lower federal courts.

It therefore remains to examine the appellees' final invocation, under 28 U.S. C. § 1331, of federal question jurisdiction.

### III. *Federal Question Jurisdiction*

Appellees suggest that if theirs is not an admiralty case, then section 921 of the Ship Mortgage Act must "implicitly create a basis for asserting Section 1331 jurisdiction." They reason that, since their asserted right, under section 921, to be free of the Bank's claims to the yacht derives from the operation of the federal Ship Mortgage Act, this must be a case "aris[ing] under the * * * laws * * * of the United States." 28 U.S.C. § 1331(a). Although, as noted above,[7] appellees err in their invocation of section 921 rather than section 1012, this miscalculation does not affect our analysis of federal question jurisdiction.

---

7. See note 2, *supra*.

■ Here, too, we are constrained to disagree with the appellees' contentions. It is settled that the mere existence of a disputed issue of federal law does not confer federal question jurisdiction. Gully v. First Nat'l Bank, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936); Meyerhoff v. Garten, 232 F.Supp. 363 (D.C.Md.1964). For a cause of action to "arise under" federal law, and thus to satisfy the requirements of § 1331, a federal right, privilege or immunity must be an essential element of the *plaintiff's* cause of action. Gully v. First Nat'l Bank, *supra*; First Nat'l Bank of Canton, Pa. v. Williams, 252 U.S. 504, 40 S.Ct. 372, 64 L.Ed. 690 (1920). If, in the plaintiff's complaint, federal matters are brought in only in anticipation of a defense or through matter irrelevant or extraneous to the plaintiff's underlying cause of action, a case arising under federal law is not presented. First Nat'l Bank of Canton, Pa. v. Williams, *supra*; Louisville & Nashville Ry. Co. v. Mottley, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297 (1911).

Not surprisingly, with a rule so dependent on the plaintiff's technical legal position, difficult questions have arisen in declaratory judgment actions where the normal legal roles are often reversed and the nominal plaintiff is in the defensive legal position, seeking only, as in the instant case, to avoid a later suit by establishing the validity of his defense in advance. The Supreme Court has squarely addressed this problem twice and has indicated strongly that the federal Declaratory Judgment Act, 28 U.S.C. § 2201, operates only to provide a hitherto unavailable federal remedy and cannot be used to create federal jurisdiction where none existed before. Public Service Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952); Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950) (Frankfurter, J.). As explained by Justice Jackson in *Wycoff*:

> Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction in the District Court. If the cause of action, which the declaratory defendant threatens to assert, does not itself involve a claim under federal law, it is doubtful if a federal court may entertain an action for a declaratory judgment establishing a defense to that claim. This is dubious even though the declaratory complaint sets forth a claim of federal right, if that right is in reality in the nature of a defense to a threatened cause of action. Federal courts will not seize litigations from state courts merely because one, normally a defendant, goes to federal court to begin his federal-law defense before the state court begins the case under state law. 344 U. S. at 248, 73 S.Ct. at 242–243.

While the final word in this area has perhaps not been written, see, e. g., Wright, Law of Federal Courts, § 18 at 62 (1970 ed.), the lower federal courts have followed the Supreme Court's approach and, in declaratory judgment actions, give controlling weight to the character of the threatened cause of action, not the defense being tested. E. g., California By and Through Dept. of Water Resources v. Oroville-Wyandotte Irrigation District, 409 F.2d 532, 535 (9th Cir. 1969); First Federal Savings and Loan Ass'n of Bowling Green, Ky. v. McReynolds, 297 F.Supp. 1159 (D.C.Ky.1969); Gov't Employees Insurance Co. v. LeBeu, 272 F.Supp. 421, 427–428 (D.C.La.1967).

■ Here it is manifest that the "threatened action" is a Bank-initiated suit, wholly under state law, either to foreclose its security interest in the Safari or to replevy the vessel. As noted in Part II, *supra*, neither of these actions could be maintained in federal court because the Bank's interest in the Safari is not "preferred" within the meaning of the Ship Mortgage Act. Hence, the contemplated action on the part of the Bank presents no federal issues and is unrelated to federal law. The federal Ship

Mortgage Act and 46 U.S.C. § 1012 may be imported into the case, but only as the appellees' federal defense to a purely state cause of action and not as a basis for federal jurisdiction. Accordingly, under the teachings of *Skelly Oil* and *Wycoff*, this action does not "arise under" federal law and federal question jurisdiction is thus not present.

### Conclusion

After three years of federal litigation, we have the cheerless task of informing the parties that their contest must be started over in the arena of the state courts. The District Judge's attention was directed away from the question of jurisdiction by the parties' apparent agreement that admiralty jurisdiction was present. But subject-matter jurisdiction cannot be conferred by agreement of the parties, and while the Judge's overlooking of the lurking jurisdictional issue is understandable, the question must be faced.

It is a frustration to dismiss a case which so obviously hinges on federal law and involves federal, rather than state, policies. Especially is this so since, despite the change of forum, the state court will still be bound to follow federal law in deciding this case. Testa v. Katt, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947). For all that appears, federal law is clear in its support of appellees' position [8] and the action we are compelled to take is all the more regrettable because the equities seem plainly with the appellees.[9]

8. See note 2, *supra*.

9. If, upon the original sale of the Safari, the Bank had arranged to withhold the Master Carpenter's Certificate from Murphy pending full payment for the yacht, the latter could not have misused the certificate to enroll the boat as one free of liens. Alternatively, the Bank could have insisted, as a condition of the sale, that Murphy federally enroll the boat and its outstanding lien at the time of the trans-

The District Court's judgment is vacated and the case is remanded with directions to dismiss.

Vacated and remanded.

action in order to afford protection of the lien.

By failing to take either precaution, the Bank opened the door to Murphy's fraud. The appellees, on the other hand, made prudent inquiries at the Customs House and relied upon the federal records as they had a right to do. More could not be expected of them. Where both parties are innocent of wrongdoing and one had it in its power to prevent the fraud while the other did not, the latter has the higher equity.