In re CAPTAINS COURAGEOUS, INC., a California corporation, doing business as CapCo, Inc., Pillar Point Fishing Trips, Pillar Point Bait and Tackle Shop, and formerly doing business as Pillar Point Marine Fuel, and The Seawitch Coffee Shop, Debtor.

IFG LEASING, a corporation, Plaintiff,

v.

CAPTAINS COURAGEOUS, INC., a California corporation, CapCo Inc., a corporation, Walter W. Jaffee, an individual, and Frederick Jacobsen, an individual, in personam and The Motor Vessel Chubasco, her engines, tackle, apparel and equipment, in rem, Defendants.

Bankruptcy No. 3–82–00022–JR.
Adv. No. 3–82–0017–JR.

United States Bankruptcy Court, N. D. California.

June 8, 1982.

Law Offices of John T. Hansen, John T. Hansen, Richard E. Driscoll, San Francisco, Cal., for debtor.

George L. Waddell, George W. Nowell, Dorr, Cooper & Hays, San Francisco, Cal., for plaintiff.

## OPINION AND ORDER

JACK RAINVILLE, Bankruptcy Judge.

### I. FACTS

Debtor, Captains Courageous (CapCo), prior to the Chapter 11 proceeding, was in the sport fishing business operating fishing party boats out of the Half Moon Bay Area.

CapCo wished to expand its operation in the year 1979 by purchasing a larger vessel.

CapCo found the boat that it needed, a vessel named Chubasco, the subject to this litigation. The Chubasco was then owned by some people named Palm in Southern California. CapCo made the Palms an offer to purchase and deposited the sum of $10,-000.00 toward the purchase price of $375,-000.00. Needing financing and being informed that plaintiff IFG was in the business of financing boat purchases, CapCo and IFG had negotiations to that end. The upshot of the negotiations was that IFG purchased the Chubasco from the Palms and contemporaneously therewith leased the Chubasco to CapCo. In furtherance of this arrangement, two documents were executed: 1) a lease of the vessel Chubasco, and 2) a document entitled Bareboat Charter Party. The lease called for monthly payments over an extended period of time and contained within it all of the usual precautionary language regarding default in payment, termination of lease, and the other incidents that are normally inserted in leases by lessors to enforce either collection of the payments or the return of the property. At the same time, they also entered into a bareboat charter party containing detailed provisions concerning the use of the boat with disclaimers of responsibility on the part of IFG and numerous provisions making CapCo responsible for maintenance, insurance, third party liability and the like.

Page 7, section 15 of the Bareboat Charter contains this language:

> On expiration of this Charter and provided Charterers have fulfilled all their obligations including payment of all charter hire to Owner, it is agreed that upon payment of $100 to Owner the Charterer will have purchased the Vessel with everything belonging to her and the Vessel will be fully paid for.

The lease and Bareboat Charter are for a period of 120 months, or ten years with

payments of $6,881.25 per month for ten years, a total of $688,125.00.

Neither the lease nor the Bareboat Charter document were ever "perfected" by taking the steps provided in the Uniform Commercial Code or elsewhere for the perfection of security instruments.

The payments due from CapCo to IFG under the documents are seriously delinquent in an amount in excess of $125,000.00. II. IFG brings this adversary proceeding for relief from stay claiming the right as lessor to terminate the lease for the defaulted payments and the right to repossess the Chubasco; in the alternative, IFG moves the court for an order pursuant to section 365 of the Bankruptcy Code requiring CapCo to accept or reject the lease within a 60-day period of time. That section provides that if the alternative of acceptance is elected by CapCo, it would be required to cure the default or provide adequate protection for the curing of the default within a short period of time. CapCo as debtor-in-possession with all of the rights of a trustee, asserts the following defenses:

1) that the lease and Bareboat Charter, though cast in that form, are mere title retention security instruments; and

2) not having been perfected by compliance with the provisions of the Uniform Commercial Code, IFG's rights thereunder are subject to the trustee's avoidance powers under Bankruptcy Code section 544(a).

To this argument, IFG makes the counter contention that the Uniform Commercial Codes specifically exempts from compliance with its perfection mechanisms any transactions governed by a supervening recording statute, i.e., the Federal Ship Mortgage Act and that they have no requirements as defined by the Uniform Commercial Code and state law.

III. This contention requires a discussion of the breadth and coverage of the Federal Ship Mortgage Act; but before undertaking that, it is well to clear up some underbrush. The court refers to the question of how this lease and Bareboat Charter would be regarded under state law and the Uniform Commercial Code. All of the lease provisions and the Bareboat Charter provisions throw upon CapCo every normal burden of ownership. To boil these two documents down, IFG's role pursuant to them is to receive monthly lease payments; and at the end of the ten-year period to transfer title to CapCo upon the payment from CapCo to IFG of $100.00. The court finds that the instruments constitute a security device; and this court need look no further than the recent Ninth Circuit decision entitled, *In re J. A. Thompson and Son, Inc.*, 665 F.2d 941 (9th Cir. 1982), which firmly aligns the Ninth Circuit with a line of cases in other circuits holding that when an instrument, though cast as a lease, contains a provision that the lessee upon compliance with the lease has the option of purchasing the property for no additional consideration or for a nominal consideration, the lease is a security instrument as a matter of law. On page 947 of that decision, the court states:

Thus, if a lease contains an option to purchase "for no additional consideration," it is conclusively presumed to be "intended as security," without reference to other facts from which the opposite inference might be drawn.

*In re J. A. Thompson and Son, Inc.*, 665 F.2d 941, 947 (9th Cir. 1982).

There are no facts from which an opposite inference could be drawn in this case even if they had any materiality.

Early in its history, the federal district and appellate courts and the Supreme Court commenced interpreting the Federal Ship Mortgage Act, 46 U.S.C. § 911, *et seq.*, respecting the extent to which the Act preempted the question of ownership, that is, the question of whether consideration of the problems involved in ownership were preempted by the maritime law of the United States or reserved to the laws of the states in which the contracts were entered into. Regarding the exclusivity of maritime jurisdiction, after several lower courts had announced varying positions on the matter, the Supreme Court of the United

States in *Detroit Trust Company v. The Barlum*, 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176 (1934), stated that the Ship Mortgage Act had not brought all ship mortgages within the admiralty jurisdiction. The Court says on page 33 of that decision:

> The grant is thus one of exclusive jurisdiction to enforce the lien of a "preferred mortgage" if the mortgage is a preferred mortgage within the definition of the act jurisdiction is granted; other wise not.

*Detroit Trust Company v. The Barlum*, 293 U.S. 21, 33, 55 S.Ct. 31, 33, 79 L.Ed. 176 (1934).

Although the quoted passage in the language of Chief Justice Hughes has been described as *dictum*, it has nevertheless been followed in a long line of cases, including a case that has not been overruled to this day, *McCorkle v. The First Pennsylvania Banking and Trust Company*, 459 F.2d 243 (4th Cir. 1972). The facts in that case were: the defendant bank had loaned money to a shipowner and taken back a security instrument which it perfected according to Maryland state law. The mortgagor subsequently registered the ship under the Federal Ship Recording Act, and a bona fide purchaser brought suit in federal court for a declaration of rights. The court concluded it was bound to follow the *Detroit Trust* case and dismissed the proceedings for lack of jurisdiction. The ultimate holding of the case was that a mortgage not covered by the Act cannot be a preferred mortgage entitled to a preferred status, but remains a common law non-maritime contract.

The authors of the treatise, *Benedict on Admiralty*, have this to say on this subject:

> Since 1920 there have been two classes of ship mortgages—mortgages made in accordance with the general laws applicable to ordinary chattels, and "preferred" ship mortgages under the Ship Mortgage Act. The latter mortgages are subject to exclusive admiralty jurisdiction, the former are beyond its scope.

2 *Benedict on Admiralty* § 71 (rev. 7th ed. 1981). *See also, Hirsch v. The San Pablo*, in which the court says on page 293:

> On the other hand, if the libel be considered to assert a lien ... to secure the purchase money advanced, libelant is in no better position.... The advancement of funds to be used in purchasing a vessel is not a maritime transaction.

*Hirsch v. The San Pablo*, 81 F.Supp. 292, 293 (S.D.Fla.1948).

IV. Has the device used here, i.e., a bareboat charter altered the conclusion reached in the *McCorkle* case? This is a somewhat involved question; but the question of the bareboat charter as a security device has come up frequently in maritime financing. For a variety of reasons the owner of a boat being purchased on borrowed money has found it advantageous to be described as a lessee instead of an owner for the purposes of favorable tax treatment as well as the purpose of (on the lender's part) avoiding the filing and foreclosure requirements of the Ship Mortgage Act. A device sprang up of the creation of a third entity (usually a corporation) which would hold title to the boat, chartering it to the owner and mortgaging it (with a federally recorded preferred ship mortgage) to the bank. An interesting discussion of this particular mortgaging device is contained in Chapter IX at page 705 of *The Law of Admiralty* by Gilmore and Black, Jr.:

> The truth is that neither the existing case law nor the codifying statute (Article 9 of the Uniform Commercial Code) provides any clear answer to a great many problems which are implicit in this complex tripartite relationship. For present purposes it will be enough to say that the bank may get under its assignment much less security than bank counsel like to think it gets.
>
> The maritime adaptation of this tripartite arrangement poses a great many questions, none of which has yet been answered. Is the charterer/lessee truly a lessee or is he an owner? Is the "owner"/lessor truly a lessor or is he the holder of a disguised security interest in the vessel? Members of the admiralty bar who engage in such transactions will neglect at their peril the distinction, long elaborated in personal property security law, be-

tween "true leases" and false or security leases.

Gilmore and Black, Jr., *The Law of Admiralty* § 9–51(a)(2d ed. 1975).

■ That text's discussion, commencing on page 718, addresses itself to the problem of filling in the many gaps in the Ship Mortgage Act. *Id.* § 9–57. The text strongly recommends recourse to Article 9 of the Uniform Commercial Code for resolution of the problems. What clearly emerges from the facts in this case, and the discussion of law contained in Black and Gilmore and in the decision of the Supreme Court in the *Detroit Trust* case and the decision of the 4th Circuit appellate court in the *McCorkle* case is that IFG, who is clearly a mere lender of money to finance the purchase of a ship by CapCo, has attempted by the device of a lease and/or charter boat hire to avail itself of title retention benefits and, in so doing, has effectively removed itself from the umbrella of the Ship Mortgage Act and placed its rights squarely within the provisions of the Uniform Commercial Code. If the tripartite arrangement as mentioned in Gilmore and Black referred to above, had been used it is *possible* that the rights of the preferred ship mortgagee would be superior to those of a trustee in bankruptcy. It is a much closer question here.

It boils down to this: IFG wants the benefits of a mortgage without any of the annoying procedural detriments and cumbersome foreclosure requirements of the Ship Mortgage Act. It is obvious that, since CapCo wanted to buy a boat, found one, and concluded a purchase contract with the owners, that it would not be content with a mere lease with reversion over the lessor at the end of the term. Just as in any situation where a person wants to buy something and gets financing to accomplish that purpose, CapCo was *purchasing*, not renting.

V. The choice used here by IFG is analogous to those recorded contracts for the sale

of real property with purported lease payments applied to the purchase and provisions for unlawful detainer remedies on default—in short, a mortgage where the mortgagee can quickly achieve an absolute foreclosure with no equity of redemption instead of having to endure the attenuated process of a mortgage foreclosure, or even having to wait out the time periods necessary for a sale under a deed of trust.

Looking through IFG's device here is the same as the California courts looking through such devices in those situations.

Carrying the analogy further, what would the trustee's position be here if such a vendee filed a bankruptcy petition? Would this court allow the vendor to have relief from stay to complete his absolute foreclosure by proceeding with an unlawful detainer action? Obviously not.

On the other hand, would the court place the vendor in the category of an unsecured creditor in the face of his *record title* to the property? This is the crucial question here, because what IFG is asserting in essence is that the locus of title in itself is enough to defeat the trustee in bankruptcy.[1]

■ *Collier on Bankruptcy* says after discussing pre-UCC enactment:

Under the Uniform Commercial Code, the location or reservation of title is irrelevant. What was a conditional sale will now be a purchase-money-security interest, which to be valid as against judicial lien creditors of the debtor must be perfected.... perfection requires a filed financing statement, proper in form and place of filing. Where such requirements are not met before bankruptcy, the trustee will be able to avoid the security interest by using section 544(a)....

4 *Collier on Bankruptcy* ¶ 541.08 (15th ed. 1982).

VI. A bareboat charter is also called a "demise" charter to distinguish it from regular time and voyage charters. The test is one of control. If the control of the vessel

1. Indeed, IFG is asserting more: it is asserting that its record title allows it the luxury of using disguised security interest "leases" without any of the normal adverse consequences flowing therefrom vis-a-vis a bankruptcy trustee.

is surrendered to the charterer (as here), then the charter is a demise. Gilmore and Black, Jr., *The Law of Admiralty* § 4–21 (2d ed. 1975).

The most important legal consequences of the demise charter flow from the fact that the demise or bareboat charterer is looked at as the owner *pro hac vice.* It is entirely possible, in spite of any language to the contrary in the charter document for liens to arise against the vessel. The extent of the duty of inquiry by furnishers of labor or supplies is a thorny problem in admiralty cases. *Id.* §§ 4–23 and 4–24 (2d ed. 1975). Since Bankruptcy Code section 544 specifically exempts the bankruptcy trustee from any "knowledge" restrictions, the trustee's avoidance powers prevail. 11 U.S.C. § 544.

The court therefore concludes:

1. The lease and Bareboat Charter constitute a security instrument and not a true lease.
2. The case and statutory law place such a non-maritime mortgage outside maritime law jurisdiction.
3. The security instrument, not having been perfected, is subject to the trustee's avoidance powers.[2]
4. Plaintiff's claim for relief from stay is denied.

---

2. If the Federal Ship Mortgage Act does not provide for the recordation of the instruments involved in this case, that circumstance is immaterial, IFG having chosen a security device inconsistent with the Act.

*Benedict on Admiralty* indicates that a non-maritime mortgage *will* be received by and recorded by the Coast Guard. 2 *Benedict on Admiralty* § 71 (rev. 7th ed. 1981).