INTERPOOL LIMITED,
Plaintiff–Appellant,

v.

CHAR YIGH MARINE (PANAMA) S.A.,
Defendant–Appellee.

No. 87–6643.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 11, 1989.

Decided Dec. 4, 1989.

David S. Porter, Ronald D. Kent, Long Beach, Cal., for plaintiff-appellant.

David E. R. Woolley, Long Beach, Cal., for defendant-appellee.

Before WALLACE, CANBY and TROTT, Circuit Judges.

TROTT, Circuit Judge:

In this admiralty, breach of contract action, Interpool, Ltd. ("Interpool") appeals the district court's order vacating its previous order granting Interpool's application for a right to attach the vessel C.C. San Francisco. Jurisdiction is proper and the appeal is timely. We vacate the district court's (second) order and remand for further proceedings consistent with this ruling.

## BACKGROUND

Between July, 1978 and January, 1983, Interpool (a Bahamian corporation) entered into a series of written agreements with Char Ching Marine (a Hong Kong corporation) and its related Taiwanese, Hong Kong, and Panamanian companies, which operated collectively as C.C. Line. These agreements provided that Interpool would lease cargo containers to Char Ching Marine to be used by C.C. Line in connection with its transpacific shipping service between ports in Asia and the United States.

One of the container-carrying vessels in the C.C. Line was the C.C. San Francisco. Instead of obtaining a straightforward ship mortgage for the vessel, C.C. Line financed the C.C. San Francisco by a series of transactions whereby C.C. Line became the lessee of the ship and a third party—owned by a lending institution—became the vessel's owner.[1] The manner in which the C.C. San Francisco was financed is worth describing in detail because it is at the center of this appeal.

E.C. Yang, the chairman of C.C. Line, formed Char Yigh Marine, S.A. ("Char Yigh") (a Panamanian corporation) on October 15, 1982. Shortly thereafter Char Yigh entered into a contract with a Japanese dockyard for the construction of the C.C. San Francisco. The purchase price of the C.C. San Francisco was 3,990,000,000 Japanese yen. Char Yigh obtained virtually all of this amount in loans from Sumitomo Bank or from its ship-financing subsidiary, Sumitomo Bank General Leasing ("SBG Leasing") (a Hong Kong corporation). Sumitomo Bank made roughly a 300,000,000 yen loan to Char Yigh in order to enable Char Yigh to make a down payment on the C.C. San Francisco. And, after delivery of the vessel, SBG Leasing loaned Char Yigh another 3,605,000,000 yen so that purchase might be completed.

By the time SBG Leasing made this second loan to Char Yigh, SBG Leasing owned Char Yigh. Two transactions had taken place immediately upon delivery of the vessel. First, SBG Leasing had purchased all shares of Char Yigh from C.C. Line for $1,000. Second, Char Yigh had entered into a charter party[2] with Char Jin Marine, S.A. (a Panamanian corporation), another C.C. Line entity, whereby Char Jin would lease the C.C. San Francisco from Char Yigh and purchase the vessel on expiration of the charter. The loan agreement between SBG Leasing and Char Yigh was expressly conditioned on these transactions having taken place.

The charter party between Char Jin and Char Yigh required Char Jin to make a series of forty "charterhire payments" to Char Yigh. The aggregate of these payments, the charter stipulated,

shall be equal to the Purchase Price of the Vessel paid by [Char Yigh] under the Shipbuilding Contract plus interest thereon at a rate equal to the aggregate of

---

1. For a general description of the use of this sort of "tripartite arrangement" in ship financing, see G. Gilmore and C. Black, *The Law of Admiralty* 704–5 (1975).

2. A "charter party" is a type of maritime contract whereby one person, the "charterer," takes over the use of a ship belonging to another, the "owner." G. Gilmore & C. Black, *The Law of Admiralty*, § 4–1 (1st ed. 1957).

the Japanese Long–Term Prime Rate as determined by [Char Yigh] prevailing one month prior to delivery of the Vessel and 1.50 per cent per annum on the basis of the whole of such sum being amortized over the term of the Charter Period.

The obligation to make these payments was "absolute unconditional." In addition, at the expiration of the charter Char Jin was required to purchase the vessel from Char Yigh by making a payment of 1,000,000,000 yen together with all other amounts due and payable under the charter.

In return for reimbursing Char Yigh for the purchase price of the vessel plus interest, Char Jin received control over and responsibility for the C.C. San Francisco. The charter provided that Char Jin would have exclusive possession of the vessel and must "man, bunker, and supply the vessel at [its] own expense." Char Jin was also charged with paying all costs incidental to use of the vessel, maintaining the vessel, insuring the vessel, and paying all taxes on the vessel. The entire risk of damage, loss, theft, destruction, or requisition of the vessel lay with Char Jin. Moreover, Char Jin indemnified Char Yigh from all "costs, liabilities, losses, expenses, damages, injuries, claims, demands, charges, taxes, levies, suits, proceedings (civil and criminal), judgments, awards, fines, sanctions, or penalties incurred in, arising from or incidental to the use, hire, lease, charter ownership, operation and maintenance of the vessel (and the replacement of all parts)...."

To summarize, the C.C. San Francisco was financed by the following series of transactions. One C.C. Line entity, Char Yigh, agreed to purchase the C.C. San Francisco. A lending institution, SBG Leasing, purchased Char Yigh on the date the vessel was delivered and then loaned Char Yigh most of the purchase price of the vessel. Char Yigh did in fact purchase the ship, and is listed as owner on the ship's Panamanian certificate of registration, but it stood to recapture the entire purchase price plus interest from another C.C. Line entity, Char Jin, which had agreed to charter or lease back the vessel. This second C.C. Line entity had complete control over and responsibility for the C.C. San Francisco and was required to purchase the ship at the termination of the charter.

## FACTS AND PROCEEDINGS BELOW

Shortly after the C.C. San Francisco went into service in 1984, C.C. Line failed to meet its contractual obligations to Interpool. At this point the C.C. San Francisco was at sea on the way from Yokohama to Long Beach. The captain disregarded a request from Char Yigh to return the vessel to Yokohama and took the vessel to Long Beach. On its arrival at Long Beach the C.C. San Francisco was arrested at the instance of Interpool, among other creditors.

Interpool had the C.C. San Francisco arrested on the basis of the maritime lien statute, which, at the time of arrest, provided:

> Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by a suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

46 U.S.C. § 971.[3] In order for Interpool to have had a valid maritime lien, its supply of cargo containers to C.C. Line would have had to have been a furnishing of necessaries to a vessel upon the order of a person authorized by the owner of the vessel. The disputable point was whether necessaries delivered to a fleet of vessels without specification of the exact vessel on which they would be used were furnished "to any vessel." The district court answered this question in the affirmative, holding that Interpool had a valid maritime lien against the C.C. San Francisco. *Flexivan Leasing, Inc. v. M/V C.C. San Francisco,*

---

**3.** This section was repealed effective January 1, 1989 and replaced by 46 U.S.C. §§ 31341 and 31342. Although the wording of the maritime lien provision has been changed, its substance remains the same.

628 F.Supp. 1077, 1080 (C.D.Cal.1985) ("[C]onsistent with modern shipping practices, the Court holds that the delivery of containers to a fleet of vessels, without specification as to a specific ship, does not defeat a maritime lien where the actual use of those containers aboard a specific ship can be proved."). The Ninth Circuit, however, reversed the district court on the grounds that necessaries leased in bulk to the charterer of a group of vessels for unrestricted use on board the vessels in that group are not furnished to any particular vessel of the group. *Foss Launch & Tug Co. v. Char Ching Shipping U.S.A., Ltd.*, 808 F.2d 697, 703 (9th Cir.1987).

In August of 1984, concurrently with the ultimately unsuccessful maritime lien action, Interpool filed a complaint against Char Jin, Char Yigh,[4] and a long list of C.C. Line companies for breach of contract, conversion, and possession of personal property. Pursuant to this action, Interpool then filed an ex parte application for an order shortening the time in which to apply for a right to attach order and a writ of attachment. Char Yigh appeared in district court in September of 1984 to oppose this application.

At this hearing, Char Yigh argued that Interpool's counsel did not have "the slightest possibility of getting his right to attach order in the end" because Char Yigh, not C.C. Line, was the registered owner of the C.C. San Francisco. Although ownership of the vessel by the defendant is not required for a maritime lien to issue, it is a necessary prerequisite of attachment. *See Swift & Co. Packers v. Compania Colombiana Del Caribe*, 339 U.S. 684, 693, 70 S.Ct. 861, 867, 94 L.Ed. 1206 (1950) (*"Swift"*). In response to the uncertainty regarding the ship's ownership, and to concerns about the cost of continuing to keep the ship under arrest, Judge Cynthia Holcomb Hall, who was then the district judge presiding over this case, re-leased the C.C. San Francisco upon a letter of undertaking issued on behalf of Char Yigh by the Sumitomo Bank in the sum of $1,000,000. The letter provided that the Sumitomo Bank would satisfy any in rem judgment against the C.C. San Francisco and any in personam judgment against Char Jin up to $1,000,000 so long as it did not exceed the value of the C.C. Line's attachable interest in the vessel. In February of 1985, the American Home Assurance Company issued a $1,000,000 bond as a substitute for the letter of undertaking.

Upon its release in September of 1984, the C.C. San Francisco sailed for Japan. After reaching Japan, the vessel was sold at auction by SBG Leasing.[5] It brought less than the balance Char Jin owed Char Yigh under the charter party.

On October 15, 1984, pursuant to California Code of Civil Procedure § 484.010, Interpool filed a full-fledged application for an order granting its right to attach the C.C. San Francisco. As noted above, ownership of the vessel by a C.C. Line entity is a threshold requirement for such an order. On December 5, 1984, the district court, Judge Jesse W. Curtis presiding, found that the charter between Char Yigh and Char Jin was not a lease with a reversionary ownership interest but a disguised security instrument. He therefore granted Interpool's application for a right to attach order. The district judge indicated in the memorandum accompanying his order that further proceedings would be necessary to determine the relative priority of Sumitomo Bank's claim on the C.C. San Francisco. A variety of motions from both sides and extensive discovery on the relationship between SBG Leasing and Sumitomo Bank followed in the wake of Judge Curtis's memorandum.

On September 15, 1986, Interpool filed a motion requesting an order substituting

---

4. Char Yigh figures in a somewhat confusing manner in this case. It is one of the list of named defendants in Interpool's August 20, 1984 complaint. Interpool acknowledges, however, that Char Yigh, in its capacity as a corporation owned by SBG Leasing, cannot be held liable for C.C. Line's breach of contract.

5. When Char Jin defaulted on its payments to Char Yigh, Char Yigh failed to meet its loan obligations to SBG Leasing. Because Char Yigh had granted a mortgage, which was not recorded until just before the C.C. San Francisco was arrested, to SBG Leasing, SBG Leasing could foreclose upon this mortgage and sell the ship at auction when it returned to Japan.

SBG Leasing for Char Yigh as real party in interest claimant to the vessel and directing SBG Leasing to increase Interpool's security for the C.C. San Francisco.[6] In response to this motion, the district judge decided to reconsider whether a C.C. Line entity had an ownership interest in the C.C. San Francisco at the time of its arrest in Long Beach. Although he reiterated his earlier conclusion that "the financial scheme under which E.C. Yang and his associates used Char Yigh and SB General Leasing to finance the vessel was as intended essentially a security transaction," Judge Curtis found that "[s]ince Char Yigh had canceled the charter party, Char Jin and C.C. Line Holding Group had no attachable interest in the vessel at the time of attachment." He therefore issued a memorandum and order reversing his earlier order granting Interpool's right to attach the C.C. San Francisco and denying Interpool's motions. On March 3, 1987, Interpool timely appealed this order.

## DISCUSSION

*Jurisdiction Below*

 The district court had jurisdiction over all three elements of the case before us: the underlying breach of contract action, the application for a right to attach order, and the question of the C.C. San Francisco's ownership. Container leases such as those between Interpool and C.C. Line companies are maritime contracts within the ambit of federal admiralty jurisdiction. *See Foss Launch & Tug Co. v. Char Ching Shipping U.S.A.*, 808 F.2d 697, 699 (9th Cir.1987). Under Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims to the Federal Rules of Civil Procedure[7] ("Supplemental Rule B"), in any admiralty or maritime claim in personam, if the defendant shall not be found within the district, "the plaintiff may, pursuant to Rule 4(e), invoke the remedies provided by state law for attachment and garnishment or similar seizure of the defendant's property." This circuit has upheld the constitutionality of supplemental Rule B. *See Polar Shipping Ltd. v. Oriental Shipping Corp.*, 680 F.2d 627 (9th Cir.1982). The Supreme Court has held that admiralty jurisdiction further extends to the determination of ownership of an attached vessel even if that determination involves the court in the examination of transactions that are "intrinsically nonmaritime":

> Disputes over ownership of attached vessels are of course inevitable since only the respondent's property may be attached.... Inevitably such disputes may involve transactions not themselves the subject matter of an independent libel.[8] If jurisdiction be wanting in a court of admiralty when such a controversy arises in the context of an attachment made in a libel over which the court indubitably has jurisdiction, a congenital defect would have to be attributed to the ancient process of foreign[9] attachment.

*Swift*, 339 U.S. at 693–94, 70 S.Ct. at 867.

*Appellate Jurisdiction*

 To be appealable, an order must either be final or fall into a specific class of interlocutory orders that are made appealable by statute or jurisprudential exception. *Save the Bay v. United States Army*, 639 F.2d 1100, 1102 (5th Cir.1981). Judge Curtis's order vacating the right to attach order previously granted is clearly not the final decision pertaining to this

---

**6.** Char Yigh was dissolved while this action was pending (Panamanian law allows the continued defense of litigation after dissolution) and thus has no assets with which to increase Interpool's attachment security.

**7.** The Supplemental Rules were promulgated by the Supreme Court and enacted by Congress in 1966. *See Schiffahartsgesellschaft Leonhardt & Co. v. Bottachi S.A. de Navegacion*, 773 F.2d 1528, 1533 (11th Cir.1985); 7A J. Moore & A. Palaez, *Moore's Federal Practice*, ¶ B.01[2] (2d ed. 1988). For a short history of maritime attachment and Supplemental Rule B, *see Schiffahartsgesellschaft Leonhardt & Co. v. Bottachi S.A. de Navegacion*, 732 F.2d 1543, 1546–48 (11th Cir.1984).

**8.** In the parlance of admiralty law, a "libel" is a complaint. *See* G. Gilmore and C. Black, *The Law of Admiralty*, §§ 1–12 (1st ed. 1957).

**9.** A "foreign" attachment is an attachment of goods of a nonresident defendant or of a defendant who is beyond the territorial jurisdiction of the court. H. Black, *Black's Law Dictionary* 115 (1979).

litigation. Nevertheless, it is appealable under a jurisprudential exception to the final order rule: the *Cohen* collateral order doctrine. *See Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1948) (*"Cohen"*).

*Cohen* held that an order other than a final judgment is properly appealable if it "finally determine[s] claims of right separable from and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Id.* at 546, 69 S.Ct. at 1225–26. In *Swift*, the Court held that *Cohen* allows appeal of an order vacating attachment of a vessel. 339 U.S. at 688–89, 70 S.Ct. at 864–65. The Court based this extension of *Cohen* on the finding that, if appellate review of the order dissolving the attachment were postponed until after that order had taken effect, restoration of the attachment would be only theoretically possible. *Id.* at 689, 70 S.Ct. at 865.

This reasoning provides a basis for our jurisdiction over the district court's order vacating Interpool's right to attach the C.C. San Francisco. We recognize that Judge Curtis's order, unlike the order in *Swift*, vacates the attachment of a vessel which has already been released on security. We reject appellee's contention, however, that *Swift*'s reasoning cannot apply to such an order. *Cf. Polar Shipping Ltd. v. Oriental Shipping Corp.*, 680 F.2d 627, 630 (9th Cir.1982) (holding that an order vacating attachment of freight charges in an admiralty case is appealable). In the circumstances of this case, it would be extremely complicated to restore security for the C.C. San Francisco once it had been released. The vessel's ownership is a complex affair. Char Yigh has been dissolved and has no assets with which to post security. And, finally, neither Char Yigh nor SBG Leasing retains possession or title to the vessel.

*Cohen* and *Swift* thus afford us jurisdiction over this appeal.

*Choice of Law*

This case involves a Bahamian plaintiff who seeks to attach a Panamanian ship arrested in California but leased by a Panamanian company (under a charter purporting to be governed by Hong Kong law) from another Panamanian company owned by a Hong Kong subsidiary of a Japanese bank. We therefore confront choice of law issues at the outset. We must determine both the basis on which to rest our choice of law and the proper law to apply. The district judge relied on California law to supply a conflict of law rule and, pursuant to that rule, applied California law.[10] We review these decisions de novo. *See Pereira v. Utah Transport*, 764 F.2d 686, 689 (9th Cir.1985).

First we must decide which country's law to apply. Char Yigh argues that the charter party's choice of Hong Kong law should be determinative. However, neither party has offered any evidence of any foreign law or how it would apply to this transaction. Where no authority, or insufficient authority, is presented by the parties about foreign law, a court may conclude that the parties have acquiesced in the application of the law of the forum. *Commercial Insurance Co. of Newark v. Pacific Peru Construction Corp.*, 558 F.2d 948, 952 (9th Cir.1977). Accordingly, we apply American law.

We next determine whether the transaction is governed by federal or state law. The Federal Ship Mortgage Act establishes the rights of parties in maritime commercial instruments. The Act is intended to supplant state law on all issues to which it speaks directly. However, the language of the Act does not address the legal issues contested here. In the absence of controlling language in the federal statute, it is unclear as to the proper source of authority. One possibility is that we should next look to state law—in this case, that of California. Alternatively, we might apply

10. California uses a situs test to determine the proper law to apply to secured transaction questions. *See Joint Holdings & Trading Co., Ltd. v. First Union National Bank of North Carolina*, 50 Cal.App.3d 159, 164, 123 Cal.Rptr. 519, 523 (1975). The C.C. San Francisco was in California at the time of attachment, and the security substituted for the ship is in California. Thus, California law dictates that we apply California law.

federal common law of admiralty. Gilmore and Black state that this question has not been satisfactorily resolved by any court. G. Gilmore and C. Black, The Law of Admiralty 718–22.

■ We need not decide this difficult issue in this case. In maritime commercial transactions, the Uniform Commercial Code is taken as indicative of the federal common law of admiralty. *Id.* at 721. On the issues before us, the relevant California statute, Cal. Com.Code § 1201, is identical to its U.C.C. counterpart. In such circumstances, "[i]t makes not the slightest difference whether [the U.C.C.] is applied directly as state law or indirectly or analogically as a statement of what the federal law of ship mortgages would be if there was a federal law of ship mortgages." *Id.* We therefore look to the identical provisions of Cal. Com. § 1201 and of U.C.C. article 1, section 201.

*C.C. Line's Interest in the C.C. San Francisco at the Time of Arrest*

Although the manner in which C.C. Line financed the C.C. San Francisco has been a common method of ship financing since World War II, few courts have directly discussed the nature of the parties' rights in the underlying property in these circumstances. *See* G. Gilmore and C. Black, *The Law of Admiralty* 704–05 (1975); *In re Captains Courageous,* 21 B.R. 134, 136–38 (Bankr.N.D.Cal.1982); *In re Merritt Dredging Co.,* 839 F.2d 203, 208–09 (4th Cir.1988). Courts have, however, considered this issue in other contexts. *See, e.g., In re Pacific Express, Inc.,* 780 F.2d 1482 (9th Cir.1986) (telecommunications equipment); *In re J.A. Thompson,* 665 F.2d 941 (9th Cir.1982) (machinery).

■ In considering the interests of parties to a lease agreement in the underlying property, courts begin by determining whether the agreement is a security instrument or a true lease. *See id.* The California Commercial Code draws the distinction between a security interest and a lease as follows:

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation.... Unless a lease or consignment is intended as security, reservation or title thereunder is not a "security interest".... Whether a lease is intended as security is determined by the facts of each case; however (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

Cal.Comm.Code § 1201(37); *see also* Uniform Comm.Code § 1–201(37). Two aspects of this provision are especially relevant to determining the nature of the charter party between Char Yigh and Char Jin. First, whether a lease agreement is a true lease or one intended for security depends on the intention of the parties at the time of execution of the agreement. *In re J.A. Thompson,* 665 F.2d at 947. Subsequent events, such as default of the lessee, cannot affect the character of the agreement or the interests of the parties thereunder. *Id.* Second, although a provision for purchase for no additional consideration or for nominal consideration renders the agreement a security instrument as a matter of law,[11] the absence of such a provision will not prevent the court from finding that a "lease" is really a disguised security instrument if the intention of the parties supports such an interpretation. As this court stated in *In re Berez,*

The true nature of a transaction is determined by the evidence and not by what the parties represent themselves to be doing.... No other purpose for [this] transaction is evident other than for him to borrow money from the buyer-lessor using his property as collateral. The absence of a purchase option in a lease does

---

**11.** *See In re J.A. Thompson,* 665 F.2d at 947; *In re Captains Courageous,* 21 B.R. 134, 136 (Bankr.N.D.Cal.1982), *vacated on other grounds,* 29 B.R. 22 (Bankr.N.D.Cal.1983).

not preclude a finding that the lease was actually a disguised security loan. 646 F.2d 420, 420–21 (9th Cir.1981).

It is a basic principle of commercial law that, if a document purporting to be a lease is in fact part of a security arrangement, the "lessor" does not have a reversionary ownership interest in the subject of the "lease." *See In re Pacific Express, Inc.*, 780 F.2d 1482, 1484–85 (9th Cir.1986) ("The formal retention of the title in a security lease serves only to reserve a security interest."); *In re J.A. Thompson*, 665 F.2d 941, 945 (9th Cir.1982). The "lessee" rather than "lessor" is viewed as the owner. *See In re Pacific Express, Inc.*, 780 F.2d at 1486 ("Because the purported 'lease' was not a true lease but a security arrangement, [the 'lessee'] owned the equipment on the date of bankruptcy."). As noted, events subsequent to the execution of the agreement cannot affect its character or the interests of the parties thereunder. Thus, the "lessee" will still be viewed as the owner even if the "lessee" made none of the required "lease" payments by the date of bankruptcy, *see id.*, and even if the "lessor" attempted to repossess the subject of the "lease" before other creditors levied claims upon it. *See In re Thompson*, 665 F.2d at 944–45.

The district court held in both its first and second orders that the agreements among Char Yigh, SBG Leasing, and Char Jin were intended to constitute a security instrument. In its second order the district court further found that the fact that Char Yigh had cancelled the charter party at the time of arrest robbed C.C. Line of its attachable interest in the C.C. San Francisco. The district court's finding that the charter party is part of a security arrangement is a finding of fact which we review under the clearly erroneous standard. The legal status of the holder of a security interest upon cancellation of the "lease" is, however, a question of law reviewable de novo. *See Gomez v. City of Watsonville*, 863 F.2d 1407, 1411 (9th Cir.1988).

The facts described in the first section of this opinion reveal the district judge to have correctly determined that the char-

ter party was intended as a security instrument rather than as a true lease. The SBG Leasing-owned Char Yigh clearly had no interest in actual ownership of the C.C. San Francisco. The charter conveying complete control over and responsibility for the vessel to Char Jin took effect at the moment SBG Leasing purchased Char Yigh. And the charter provided for payments equal to the purchase price of the vessel plus interest and for mandatory purchase of the ship by Char Jin at the end of the charter period. There was thus to be no period in which the SBG Leasing-owned Char Yigh actually had possession or control over the C.C. San Francisco. To paraphrase *In re Berez*, it is difficult to conceive of another purpose for this transaction than for C.C. Line to borrow money from SBG Leasing using the C.C. San Francisco as collateral. *See* 646 F.2d at 421. Char Yigh's president, Mr. Uchida, admitted in his testimony that the purpose of the financing arrangement's structure was to give SBG Leasing greater security than it would have had under a preferred ship mortgage from Char Jin.

Because Char Yigh and Char Jin intended the charter party as a security instrument at the time of execution, we must consider Char Jin to be the true owner of the vessel. *See In re Pacific Express*, 780 F.2d at 1484–86. Subsequent events could not have changed the character of the agreement or robbed Char Jin of its corresponding ownership interest in the C.C. San Francisco. *See In re J.A. Thompson*, 665 F.2d at 947. The fact that Char Yigh is listed as owner on the vessel's registration certificate does not undermine this analysis. Neither California nor federal law regards registration as conclusive proof of ownership. *See Chartered Bank of London v. Chrysler Corp.*, 115 Cal. App.3d 755, 761, 171 Cal.Rptr. 748, 751 (1981); *see also* 46 U.S.C. § 12104(3); *ITT Indus. Credit Co. v. M/V Richard C.*, 617 F.Supp. 761 (D.C.La.1985) ("The ownership of a vessel is not dependent on its registration.").

We thus conclude that the district judge erred in concluding that cancellation of the charter party prior to the arrest of the C.C.

San Francisco could affect, let alone destroy, C.C. Line's interest in the vessel. C.C. Line had an attachable interest in the C.C. San Francisco at the time of its arrest in Long Beach. To hold otherwise would be to grant Char Yigh a more privileged status than that assigned other "lessors" simply because this case involves the financing of ships rather then of, for example, telecommunications equipment or machinery. We do not believe there to be a reasonable basis for affording the holder of a security interest in a ship greater security than the holder of a security interest in other property.

## CONCLUSION

Ownership of a vessel by a defendant is a threshold requirement for the right of the defendant's creditors to attach the vessel. The district court incorrectly found that this threshold requirement had not been met and therefore did not engage in a full analysis of whether Interpool has the right to attach the C.C. San Francisco.[12] We therefore VACATE the district court's order vacating its previous order granting Interpool's right to attach the C.C. San Francisco and REMAND for full consideration of whether Interpool possesses such a right. Appellant is entitled to its costs. VACATED and REMANDED

---

12. Although we leave for the district court the task of determining whether Interpool had a right to attach the vessel, we wish to note the erroneousness of appellee's contention that California law prohibits attachment of foreign-owned vessels. Section 488.475 of the California Code of Civil Procedure permits the attachment of tangible personal property in control of a levying officer. The C.C. San Francisco was in control of a levying officer, a U.S. Marshal, at the time of attachment.