INTERNATIONAL COMMODITIES EXPORT CORPORATION, Plaintiff,

v.

NORTH PACIFIC LUMBER CO., INC., Defendant.

Civ. No. 90–357–RE.

United States District Court, D. Oregon.

April 9, 1991.

Michael G. Hanlon, Portland, Or., Turner P. Smith, Curtis, Mallet–Prevost, Colt & Mosle, New York City, for plaintiff.

Robert L. Allen, Jonathan A. Bennett, Dunn, Carney, Allen, Higgins & Tongue, Portland, Or., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

REDDEN, Chief Judge:

A two-day court trial was held beginning on March 22, 1991 to resolve this dispute. The parties are citizens of different states and the matter in controversy exceeds the sum or value of $50,000 exclusive of interest and costs. Therefore, this court has subject matter jurisdiction over this matter pursuant to diversity. 28 U.S.C. § 1332.

## FINDINGS OF FACT

1. On or about August 2–4, 1988, plaintiff International Commodities Export Corporation (ICEC), prepared sales contract no. L35701 which memorialized the final agreement reached regarding the sale of 230 metric tons of Chinese small white beans to defendant North Pacific Lumber Company (North Pacific). (See plaintiff's exh. 6).

2. The sale was made on a C. & F. basis to Portland, Oregon, the port designated by North Pacific. (See plaintiff's exh. 4, 5, 6).

3. The parties' agreement included the following terms:

(a) the beans were to conform to sample PC–16;

(b) shipment was to be "C. & F. liner terms" Portland, Oregon;

(c) North Pacific would pay ICEC $570 per metric ton for 230 metric tons of beans (plus or minus five percent);

(d) payment would be made by North Pacific to ICEC "NCRI/ Documents" (net cash receipt of invoice and documents). The documents ICEC was to deliver to North Pacific included a weight certificate, quality certificate, certificate of origin, and bills of lading. (See plaintiff's exh. 6).

4. On or about August 26, 1988, six separate containers of beans (approximately 2,100 bags) were loaded on board the vessel "Jian He" at the port of Hong Kong. The "Jian He" sailed on or about August 26, 1988 and arrived in Portland on or about September 18, 1988.

5. On or about September 4, 1988, seven containers of beans (approximately 2,433 bags) were loaded on board the vessel "Tokyo Maru" at the port of Hong Kong. The "Tokyo Maru" sailed on or about September 4, 1988, and arrived in Portland on or about September 25, 1988.

6. The certificates of quality were prepared by an independent marine and cargo surveyor, Andrew & Paulmann (H.K.) Ltd. These inspection certificates of quality verified that the surveyor had opened at random three percent of the total consignment and found the bean quality to be in conformity with the description of the goods

as stipulated in the shipper's invoice. (See defendant's exh. 1033).

7. Prior to October 7, 1988, North Pacific's representative, Mr. Lowry contacted ICEC's representative, Mr. Lenti and told him that the beans were not white enough, they were dirty and they did not conform to the sample. (See Lowry's trial testimony and plaintiff's exh. 27, 85, 85).

8. On or about October 7, 1988, Lenti and Lowry inspected some of the beans that were stored both in the Portland and MG warehouses. They found that there were some variations in the beans. (See plaintiff's exh. 84, 85).

9. On October 4, 1988, the Food and Drug Administration (FDA) collected a twenty pound sample of beans from the "Jian He" shipment (sample '274). After inspecting the beans, on October 15, 1988, the FDA detained the shipment concluding they "contain[ed] filth." (See plaintiff's exh. 33).

10. On October 12, 1988, the FDA collected a twenty pound sample of beans from the "Tokyo Maru" shipment (sample '283). After inspecting the beans, on November 1, 1988, the FDA detained the shipment concluding they were "unfit for food in that [the beans had a] musty/moldy odor, moldy beans present." (See plaintiff's exh. 34).

11. After the beans were delivered to the Portland and MG warehouses, the parties exchanged a series of facsimile transmittals (fax) throughout October 1988, where defendant complained of the quality of the beans and outlined its progress in getting the beans approved by the FDA. Plaintiff received a fax from defendant dated October 25, 1988 which indicated that defendant was "working to arrange [a] sale subject [to the] FDA's final release of goods." Defendant stated that it hoped to have the problem resolved in "1–2" weeks. (See plaintiff's exh. 22). Plaintiff heard nothing from defendant for the following 3½ months until February 9, 1989 when defendant sent plaintiff a fax stating that the FDA had still not released the beans and "North Pacific Trading must look to I.C.E.C. for help and cooperation in this matter." (See plaintiff's exh. 65). Another two months passed before defendant again contacted plaintiff on April 3, 1989 stating that defendant "is going to look to I.C.E.C. to help resolve this problem." (See plaintiff's exh. 70). I find no language in any of defendant's communications with plaintiff which indicates a clear and unequivocal rejection of the beans.

12. Defendant's Vice–President, Robert Reynolds, stated in his affidavit for Support of Motion for Change of Venue from New York to Oregon that

> [r]ather than rejecting the shipment immediately, at ICEC's urging, North Pacific sought to obtain the FDA's approval of a plan to recondition the beans in order to bring them up to import standards. Since their arrival, the beans have been stored in a warehouse in Portland, Oregon under federal government detention. Despite substantial efforts by North Pacific to propose a plan in an attempt to cleanse the beans, the government has refused to lift the detention order. After exhaustive efforts in Portland to secure the release of the beans, by letter dated July 3, 1989, North Pacific rejected the shipments for failure to conform with Sample PC–16 as warranted by ICEC.

Reynolds' Affidavit in Support of Motion for Change of Venue, September 28, 1989, p. 4, para. 9.

13. On January 10, 1989, the USDA graded each shipment of beans as "U.S. No. 2, small white beans." The USDA found a total of 3.6 percent defects in the beans from the Portland warehouse and 4.0 percent in the beans from the MG warehouse. (See plaintiff's exh. 12, 13).

14. By letter to plaintiff dated July 3, 1989, defendant rejected the beans in their entirety and tendered the beans back to plaintiff for safekeeping. (See plaintiff's exh. 69).

15. North Pacific sold the beans to a buyer in South Africa per North Pacific's "Order Acceptance" dated January 15, 1990. (See plaintiff's exh. 40, 54 and 55).

## CONCLUSIONS OF LAW

■ 1. Defendant accepted the goods when, after a reasonable opportunity to inspect the goods, it signified to plaintiff that it would take or retain them in spite of their alleged non-conformity. (See U.C.C. § 2–606(1)(a)).

■ 2. Defendant failed to make an effective rejection of the goods until July 3, 1989, at which time the rejection was not timely. This failure constitutes an acceptance of the goods. I find no language by defendant of clear and unequivocal rejection of the beans in any of the communications between the parties, including the October 6, 1988 meeting between Lenti, Lowry and Reynolds in Portland, Oregon, up until the July 3, 1989 letter. (See U.C.C. §§ 2–606(1)(b), 2–602(1)).

■ 3. Once the defendant accepted the beans, the burden is on the defendant to establish any nonconformity of the goods to the contract. (See U.C.C. § 2–607(4)).

■ 4. Upon the presentation of documents in good order at the place of shipment (Hong Kong), title to the goods passed from plaintiff and the risk of deterioration or loss shifted to defendant. Under a C. & F. contract, whatever happened to the beans on board the vessel or after delivery to defendant at the port of destination was not the responsibility of plaintiff. That was a risk expressly assumed by the defendant under a C. & F. shipment contract. (See U.C.C. §§ 2–320(1), (3)).

■ 5. The "Inspection Certificate of Quality," conducted and prepared by Andrew & Paulmann (H.K.) Ltd., concluded that the "quality [of the beans] was in conformity with [the] description of goods as stipulated in shipper's invoice." These documents are *prima facie* evidence of the fulfillment of plaintiff's obligation under the contract. (See U.C.C. § 1–202 ("document authorized or required by the contract to be issued by a third party shall be *prima facie* evidence of its own authenticity and genuineness and of the facts stated in the document by the third party")).

6. Over a month passed between the time the beans had been placed in defendant's custody in Hong Kong and the discovery of microscopic evidence of mold by the FDA. (See plaintiff's exh. 33, 34).

7. The defendant failed to revoke its acceptance of the goods until July 3, 1989 at which time the revocation was not timely. (See U.C.C. § 2–608(2) and plaintiff's exh. 69).

■ 8. Proof of a revocation of acceptance is judged by a stricter standard than notification of breach. (See U.C.C. § 2–608, comment 5).

■ 9. Defendant failed to comply with the notice requirements of revocation of acceptance. The official comment to U.C.C. § 2–608 states that the content of the notice required to be given to a seller is governed by

> considerations of good faith, prevention of surprise, and reasonable adjustment. *More will generally be necessary than the mere notification of breach . . . .*

U.C.C. § 2–608, comment 5 (emphasis added). *See also, Solar Kinetics Corp. v. Ryerson & Son, Inc.,* 488 F.Supp. 1237, 1247 (D.Conn.1980) (notice of revocation should inform the seller that the buyer has revoked, buyer's notification to seller that the goods were "unsatisfactory" was insufficient); *Delhomme Industries, Inc. v. Houston Beechcraft, Inc.,* 735 F.2d 177, 181, n. 5 (5th Cir.1984) (revocation of acceptance by a buyer under the UCC "is necessarily a recognition by the buyer that the property belongs to the seller"); and *C.R. Daniels, Inc. v. Yazoo Mfg. Co., Inc.,* 641 F.Supp. 205, 209 (S.D.Miss.1986) (buyer's continued attempts to sell the goods signified to seller that the goods were accepted in spite of buyer's knowledge of their nonconformity).

10. Up until July 3, 1989, the defendant exercised ownership of the goods and performed acts inconsistent with plaintiff's alleged ownership of the goods. (See U.C.C. §§ 2–602(2)(a), 2–606(1)(c)).

11. The defendant continued to attempt to sell the beans for nine months after the beans arrived in Portland and prior to rejecting the beans on July 3, 1989.

**612**

Throughout those nine months, defendant exercised dominion and control over the beans and at no time did defendant tender ownership or control of the beans to plaintiff.

12. I find no evidence that plaintiff ever issued, or that the defendant ever followed any "instructions" from plaintiff as to what to do with the beans once they arrived in Portland. (See U.C.C. § 2–603(1)).

13. Even after the FDA's inspection and detention of the beans on October 15, 1988 and November 1, 1988, plaintiff continued to exercise dominion and control over the beans by attempting to sell them and by creating and proposing various plans to recondition the beans to the FDA. (See plaintiff's exh. 29, 31, 36, 37, 38).

CONCLUSION

I find that plaintiff's contractual obligations were fulfilled when it delivered the beans, certified by an independent surveyor as conforming to contract specifications, into the hold of the chartered vessels. I award plaintiff declaratory relief finding that plaintiff's obligations have been fulfilled and that no sums are due or other liability has accrued to defendant.