**CHINA NATIONAL METAL PRODUCTS IMPORT/EXPORT COMPANY, Plaintiff,**

v.

**APEX DIGITAL, INC., Defendant.**

**No. EDCV 01–130–RT (SGL).**

United States District Court,
C.D. California.

May 1, 2001.

---

Jeffrey S Gordon, Julian Brew, Kaye Scholer Fierman Hays & Handler, Los Angeles, CA, for China National Metal Products Import/Export Company, plaintiff.

Craig Wallace Smith, Kenneth R O'Rourke, Bonnie L Hobbs, O'Melveny & Myers, Los Angeles, CA, for Apex Digital Inc, defendant.

## ORDER REGARDING APPLICATION FOR WRIT OF ATTACHMENT

LARSON, United States Magistrate Judge.

It pays to know when to say "when." Apex Digital, Inc. ("Apex") did not heed this saying. Pursuant to various purchase contracts, Apex imported Digital Versatile Disk ("DVD") players from China National Metal Products Import/Export Company ("China National"). Soon thereafter Apex began receiving customer complaints concerning the quality of the DVD players and a flood of returned DVD players later filled their warehouse. Rather than seek to revoke the contracts or return all the defective DVD players it had received from customers, Apex continued to order more DVD players but later refused to pay for them. Instead, Apex turned around and continued to sell these DVD players to retail outlet chains. Both parties, pursuant to an arbitration clause in their purchase contracts, filed for an arbitration of their dispute before the China International Economic Trade Arbitration Commission ("CIETAC"). China National, however, has also sought from this Court a Right to Attach Order and for Writs of Attachment against Apex's property in the amount of $22,742,340. For the reasons and in the manner set forth below, the Right to Attach Order and the application for Writs of Attachment are **GRANTED**.

## BACKGROUND

Apex is a company incorporated and headquartered in Ontario, California, whose principal business is importing consumer electronic goods and then distributing those goods under the "Apex Digital" brand name to national retailers, such as Circuit City, Best Buy, and K–Mart. (Hsu Decl. ¶ 4, 5, 11). Apex imports its line of DVD players from various Chinese manufacturers. (Hsu Decl. ¶ 5).

China National is a corporation organized under the laws of China and is based in Beijing, China. (Gang Decl. ¶ 2). Chinese companies are permitted to import and export goods only if they have a government license granting them specific "foreign trading" rights. (Ji Decl. ¶ 4).

China National has been granted foreign trade rights and has made its principal business facilitating the import and export of goods between Chinese and foreign companies. *Id.*

In the early part of 2000, Apex became interested in purchasing and importing into the United States DVD players manufactured by Jiangsu Shinco Electronic Group Company ("Shinco"), a Chinese company located in Changzhou, in the Chinese province of Jiangsu. (Ji Decl. ¶ 5). Shinco, however, did not have foreign trading rights. *Id.* Given China's foreign trade law, a three-way transaction between Apex, China National, and Shinco was required in order for Apex to purchase Shinco's DVD players. To that end, China National and Shinco entered into a Purchase Agreement for Export on June 25, 2000. According to the terms of the Purchase Agreement, China National agreed to purchase DVD players from Shinco and then "enter into export contracts with foreign importers." (Ji Decl. Ex. A). China National also agreed to see that the export contracts were performed, including collection of payments on the goods shipped, and to act as a liaison between Shinco and the foreign importers. *Id.* Shinco, in turn, agreed to guarantee "the quality of the products directly to [the] foreign importers" and agreed to "accept the products returned from the market." *Id.* On the same day, Apex, Shinco, and China National signed a Letter of Intent whereby Shinco agreed to provide Apex from August to November, 2000, with 600,000 DVD players, and China National agreed to "use its best efforts to lend assistance ... so that such export[ ] proceed[ed] smoothly and end[s] successfully." (Ji Decl. Ex. B). Issues such as purchase price, payment terms, and port of destination, however, were not addressed in the Letter of Intent. *Id.*

From July through October, 2000, Apex placed orders for AD–500A and AD–703 model DVD players from China National. (Ji Decl. Ex. C). The model AD–500A is a lower cost, single-disk unit capable of playing DVDs, CDs, and other digital media. (Ji Decl. ¶ 9). The AD–703 model plays the same media disks, but also plays MP3 files and includes a disk loader and changer that will handle up to three disks at one time. *Id.*

The purchase of the DVD players took the form of a series of separate but substantially identical written contracts. (Ji Decl. ¶ 12; Gang Amend. Decl. ¶ 3). The contracts set forth the model number and quantity of the DVD players ordered, the price for each of the DVD players, the time of shipment, the port of destination, and the manner of payment. (Gang Amend. Decl. Ex. 1). The DVD players ordered pursuant to these contracts were then delivered in a series of shipments. Approximately ten days prior to each shipment, Apex was billed with an invoice identifying which contract number the units were being purchased under and incorporating the purchase price terms contained in that contract. (Gang Amend. Decl. Ex. 5; Hr'g April 26, 2001). The units would then be loaded on a cargo ship for an approximately two-week trans-Pacific journey to the United States. (Hr'g April 26, 2001). Thus, approximately twenty-four days would elapse from the date the invoice was submitted to Apex to when the units would actually arrive in the United States. The last shipment of DVD players in this case was sent on November 22, 2000, meaning they were delivered to Apex sometime early in December, 2000. (Gang Supp. Decl. ¶ 3).

Each of the contracts entered into by the parties also contained two provisions significant to this case. The contracts provided in paragraph 13:

QUALITY/QUANTITY DISCREPAN-CY and CLAIM: In case the quality . . . are found ·by the Buyers to be not in conformity with the Contract after arrival of the goods at the port of destination, the Buyers may lodge claim with the Sellers supported by survey report issued by an inspection organisation agreed upon by both parties . . . . Claim for quality discrepancy should be filed by the Buyers within 30 days after arrival of the goods at the port of destination . . . . The Sellers shall, within 30 days after receipt of the notification of the claim, send reply to the Buyers.

(Gang Amend. Decl. Ex. 1). In paragraph 15, the contracts also provided:

ARBITRATION: All disputes arising from or in connection with this Contract shall be submitted to China International Economic and Trade Arbitration Commission for arbitration which shall be conducted by the Commission in Beijing or by its Shenzhen Sub–Commission in Shenzhen or by its Shanghai Sub–Commission in Shanghai at the Claim-ant's option in accordance with the Commission's arbitration rules in effect at the time for applying for arbitration. The arbitral award is final and binding upon both parties.

*Id.*

In total, Apex purchased 171,452 AD–500As from China National at $105 per unit, and 133,280 AD–703s at $133 per unit. (McGowan Decl. ¶ 6; Hsu Decl. ¶ 14).[1]

China National's first shipments of Model AD–500A and AD–703 DVD players were delivered in July, 2000. (Hr'g April 26, 2001). Soon thereafter Apex began receiving reports from its retail distributors that customers were dissatisfied with the DVD players. (Lo Decl. ¶ 14, 16). The complaints covered a wide spectrum of structural and software problems, including disk loaders that did not open or that did not load the disk once it was inserted in the machine; the DVD Player flashing a "no disk" signal even after the disk was inserted; the front panel of the DVD loader falling off after use; an inability to

---

**1.** The parties have sparred at length over certain Lockbox Agreements entered into between China National and Apex and the failures and mishaps with respect to the shipment of the AD–800As, a high-end DVD player. China National's writ of attachment application, however, concerns Apex's failure to pay on the contracts for the AD–500As and AD–703s. In other words, liability is premised on the failure to pay, not the failure to adhere to a particular manner of payment. Moreover, the contracts for the AD–500As and the AD–703s are separate from those for the AD–800A. In their arbitration papers filed with CIETAC and in their papers filed with this Court, both China National and Apex have characterized the AD–500A and AD–703 as being purchased "pursuant to a series of substantially identical purchase order contracts." (Ji Decl. Ex. I at 2; Memorandum in Support at 2). Given that the parties themselves agree that the AD–500A and AD–703 were purchased pursuant to contracts separate from those for the AD–800A, the problems surrounding the delivery of the AD–800As cannot serve as an affirmative defense to China National's claims regarding the AD–500As and AD–703s. Rather, Apex must seek an offset for the AD–800As by way of a formal cross-complaint. *See* CAL. CIV. P. CODE § 483.015(b)(2) (noting that the amount secured by a writ of attachment shall be reduced by the "amount of any indebtedness of the plaintiff that the defendant has claimed in a *cross-complaint* filed in the action"). Apex, however, has not filed with this Court such a formal cross-complaint. Without a formal cross-complaint, the Court cannot look to the costs and damages Apex allegedly incurred with respect to the AD–800As for purposes of reducing or offsetting the amount China National seeks for a writ of attachment on the contracts for the AD–500As and AD–703s. Accordingly, the Court declines further discussion of either the Lockbox Agreements or the AD–800As in this Order.

recognize or play MP3 music files; failure to play certain movies properly (some movies did not show at all, in others the picture was not clear, and with some the disks would skip from one part of the movie to another); the pause function self-activating during disk play; and finally, in a manner reminiscent of a badly dubbed martial-arts film, a delay of several seconds in the audio such that spoken words were heard well after an actor's lips moved. (Lo Decl. ¶ 15). One customer, for example, wrote "Call me a dummy, [I] bought the Apex DVD player," while another observed that the only thing that the Apex DVD player was good for was as a boat anchor. (Lo Decl. Ex. K). These customer complaints sparked Apex's engineers, beginning in August, 2000, to test and physically examine the defective DVD players. (Lo Decl. ¶ 14; Hr'g April 26, 2001).

With customer complaints mounting, so too was the return rates for the AD–500As and AD–703s. Through December, 2000, customers had returned approximately 4.2% of all AD–500A units sold, and over 6% of AD–703 units sold. (McGowan Decl. Ex. H). Apex's DVD players normally enjoyed a return rate of almost 4%. (Ji Decl. ¶ 28). Despite their knowledge of these defects, Apex continued to place orders for more DVD players from China National through November, 2000. (Gang Amend. Decl. Ex. 5). Indeed, the quantity of goods ordered by Apex *accelerated after the defects with the DVD players came to light. Id.*

Apex complained to representatives from China National about these defects as early as October, 2000. Specifically, "[d]uring October and November 2000, and up to the present, [Apex's President] had numerous discussions with [representatives from China National,] both over the telephone and in face-to-face meetings in China and in the U.S., in which [he] told [China National] that … the defects in the AD–500As and AD–703s were unacceptable and that Apex considered [China National] to be in breach of its contracts with Apex to deliver conforming and acceptable DVD players in a timely manner." (Ji Decl. ¶ 29).[2]

In the meantime, Apex's engineers and technical staff began in September, 2000, to correspond with *Shinco's* technical personnel in an effort to isolate the reason for the defects in the AD–500As and AD–703s. (Lo Decl. ¶ 16). The correspondence took the form of e-mails, facsimiles, and technical drawings exchanged between Apex and Shinco from September through December, 2000. (Lo Decl. Exs. C, D, E, L). Correspondence sent from Apex's engineers in early September, 2000, noted that the AD–703 "freezes up," the "discs jam," there was "no power control on the DVD remote," and there was "looping problems" with the playing of certain movies. (Lo Decl. Ex. L). The parties' correspondence ultimately culminated with an engineer from Shinco traveling to Apex's facility in December, 2000, to inspect some of the returned DVD players. (Lo Decl. ¶ 17). The parties' efforts to correct the defects, however, proved unsuccessful.

Contemporaneously, Apex began receiving complaints from some of its retail distributors, most notably Circuit City, threatening to seek indemnification for the losses incurred in refunding DVD players returned by their customers. (Hsu Decl. ¶¶ 24, 25, 26). Circuit City, in fact, later informed Apex that it would seek to hold it accountable for most of the $3,189,550 in losses it had suffered on account of returned or recalled DVD players. (Hsu Decl. Ex. D). These strains with its retail

---

2. China National has not objected to this portion of Mr. Ji's declaration.

distributors prompted Apex's President, Mr. Ji, to acknowledge to China National, on more than one occasion, that Apex was having "financial difficulties" that made it hard for Apex to pay its invoices. (Gang Amend. Decl. ¶ 12).[3]

Apex eventually elected (sometime after December 29, 2000) to withhold paying the remaining invoices submitted by China National for the AD–500As and AD–703s delivered from August until November. (Ji Decl. ¶ 31). The specific contracts (and the corresponding invoices) affected by Apex's decision are reproduced below:

### CONTRACT 00US11WSC85210208

| INVOICE NO. | AMOUNT OWED | INVOICE DATE |
| --- | --- | --- |
| 00K033H0258 | $1,808,800 | October 13, 2000 |
| 00K033H0270 | $1,627,920 | October 19, 2000 |
| 00K033H0278 | $ 180,880 | October 19, 2000 |
| 00K033H0291 | $1,150,000 | November 16, 2000 |

### CONTRACT 00US11WSC85210224–1

| INVOICE NO. | AMOUNT OWED | INVOICE DATE |
| --- | --- | --- |
| 00K033H0225 | $2,351,440 | August 23, 2000 |

### CONTRACT 00US11WSC85210232A

| INVOICE NO. | AMOUNT OWED | INVOICE DATE |
| --- | --- | --- |
| 00K033H0243 | $1,179,360 | September 8, 2000 |
| 00K033H0247 | $1,179,360 | September 14, 2000 |
| 00K033H0248 | $1,266,160 | September 14, 2000 |
| 00K033H0249 | $ 786,240 | September 20, 2000 |
| 00K033H0250 | $1,989,680 | September 20, 2000 |

### CONTRACTS 00US11WSC85210271 and 0271A–1

| INVOICE NO. | AMOUNT OWED | INVOICE DATE |
| --- | --- | --- |
| 00K033H0257 | $1,853,280 | October 12, 2000 |
| 00K033H0272 | $2,302,320 | October 12, 2000 |
| 00K033H0276 | $ 215,280 | October 19, 2000 |
| 00K033H0277 | $ 861,120 | October 27, 2000 |
| 00K033H0281 | $ 943,000 | November 3, 2000 |

### CONTRACT 00US11WSC85210301

| INVOICE NO. | AMOUNT OWED | INVOICE DATE |
| --- | --- | --- |
| 00K033H0286 | $1,076,400 | November 9, 2000 |
| 00K033H0289 | $1,076,400 | November 16, 2000 |

| | | |
| --- | --- | --- |
| 00K033H0290 | $ 894,700 | November 16, 2000 |

(Compl. ¶ 12).

Faced with Apex's refusal to pay, China National wrote the following letter on January 25, 2001:

> We hereby notify you that you are in default under the various contracts executed between [China National] and [Apex] relating to the purchase by Apex of DVD players.
>
> . . . . .
>
> Unless Apex immediately pays [China National] all outstanding amounts owed, [China National] intends to pursue any and all legal remedies available to it at law or in equity with respect to the foregoing defaults, including without limitation, those provided by division 9 of the UCC and the contract.

(Gang Amend. Decl. Ex. 6).

Apex paid some, but not all, of the outstanding invoices after receiving China National's letter. Not satisfied with Apex's response, China National sent another letter on February 14, 2001, mirroring the warnings contained in the January 25, 2001, letter, and identifying additional invoices that Apex had not paid. (Gang Amend. Decl. Ex. 7). On February 19, 2001, Apex sent the following letter to China National:

> With respect to the AD–500A and AD–703 units shipped to Apex pursuant to the contracts you have mentioned in your letter, Apex has previously indicated on several occasions that its customers, including Circuit City, have experienced a significantly higher than normal return rate on these units of over ten percent. The returns are due to various

---

3. Apex has objected to this representation in Mr. Gang's declaration, labeling it as vague and hearsay. Apex's contention that Mr. Ji's alleged statements are hearsay are without merit. Federal Rule of Evidence 801(d)(2) provides that the admission of a party opponent is not hearsay. Whether Mr. Gang's representation is unduly vague does not concern whether his representation is admissible. Accordingly, Apex's objection to this portion of Mr. Gang's declaration is overruled.

mechanical defects in these units, including in some instances, defective loading mechanisms. . . .

Apex has been forced to refund to Circuit City the price paid by Circuit City for every AD–500A and AD–703 unit returned by Circuit City customers, and has incurred significant additional financial losses on sales of the returned units. Apex is also subject to potential claims by Circuit City for its significant financial losses on sales of the returned AD–500As and AD–703s.

Apex would like to resolve those issues amicably and will continue to make a good faith effort to come to a mutually acceptable arrangement with China National Metals regarding the financial losses of Apex and third parties described above.

(Hsu Decl. Ex. E).

In January, prior to the exchange of letters, Apex had returned a total of 21,069 AD–500A and 11,692 AD–703 units to China National, whose combined value, using the contract price, is $3,767,281. (Hsu Decl. ¶ 22).[4] Prior to the hearing in this case, Apex still had 20,000 AD–703s and 23,000 AD–500As in its warehouse. (Hsu Decl. ¶ 23). The AD–500As held in storage have since been sold to K–Mart, where they are no doubt the subject of many a "blue light special." (Hsu Decl. ¶ 23). After the hearing, Apex informed the Court that it sold 5,400 of the AD–703s to Circuit City at $138.50 per unit and sold 10,000 of the AD–703s to E & S International at $144 per unit. (Hsu Supp. Decl. ¶ 5). Apex has also represented to the Court

that it intends to return the remaining 4,600 AD–703 units to China National. (Hsu Supp. Decl. ¶ 9). The value of these remaining units, using the contract price, is $611,800.

After the exchange of letters, both parties eventually filed applications for arbitration before CIETAC. (Ji Decl. Ex. I; China National Notice of Lodging Ex. A at 70). In the interim, China National has filed a complaint in this Court requesting that certain provisional remedies, namely a writ of attachment against Apex's property, be granted while the arbitration proceedings are pending before CIETAC. Given that the parties are from different countries and have agreed in writing (namely, the purchase order contracts) to have their dispute resolved by way of arbitration before CIETAC, the Court's jurisdiction in this case is premised upon the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"). *See* 9 U.S.C. § 201 *et seq.*

## ANALYSIS

### A. *JURISDICTION*

Apex has raised two grounds, one general and the other more specific, challenging this Court's jurisdiction to consider China National's application for a writ of attachment. Apex first contends that, in general, the awarding of provisional remedies like writs of attachment conflicts with the Convention. Should this defense fail, Apex also contends that granting a writ of attachment would specifically conflict with

---

**4.** China National claims that the value of the returned goods is only $3,499,685. (Gang Amend. Decl. ¶ 9; Gang Supp. Decl. ¶ 4). Unlike Apex's representations, nowhere has China National demonstrated how it arrived at this number. Rather, Mr. Gang's declarations merely state that China National received small portions of the DVD players

shipped under invoices OOK033H0247, 248 and 249 that total $3,499,685 without specifying the quantity and model number of the units so returned. Given the specificity in Mr. Hsu's declaration, the Court finds Apex's representation on the number of DVD players returned to be the best evidence of that number.

CIETAC's rules. The Court will address each argument in turn.

■ Apex's first contention stems from its reading of Article II, clause 3 to the Convention. There it is provided that when a court is "seized of an action" falling within the terms of the article (which neither party disputes as being the case), it "shall, at the request of one of the parties, refer the parties to arbitration." Apex attempts to divine a substantive meaning from the use of the phrase "shall refer" by making reference to a somewhat similar provision in the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., the domestic counterpart to the Convention. The FAA provides that when a federal court has before it an action subject to the Act, it "shall ... stay the trial of the action until such arbitration has been had." 9 U.S.C. § 3. "Referring" a matter requires that the action itself be dismissed, whereas simply "staying" a matter keeps the action before the court, albeit in a state of limbo. Or at least that is the argument. From this Apex adds a further gloss: Whether a court can grant provisional remedies turns on whether the matter remains before the court after being sent to arbitration. Since a matter is "referred" to the arbitral panel under the Convention, so too Apex says goes the court's ability to grant provisional remedies. For support of its reading of the Convention, Apex points to the Third Circuit's decision in McCreary Tire & Rubber Co. v. CEAT S.P.A., 501 F.2d 1032 (3rd Cir.1974).

There the court held both that the specific language in the Convention cited above precluded the granting of provisional remedies and that the granting of such remedies was antithetical to any agreement to arbitrate. Id. at 1038. Since McCreary, courts, both foreign and domestic, have not been convinced by its reasoning. Those courts have noted that the linguistic and legal hairsplitting pressed by Apex is not necessarily mandated by the Convention, nor is McCreary's argument that the granting of provisional remedies would undermine arbitration proceedings persuasive. See Borden v. Meiji Milk Prod. Co., 919 F.2d 822 (2nd Cir.1990) (declining to follow McCreary ); E.A.S.T., Inc. v. M/V Alaia, 876 F.2d 1168 (5th Cir.1989) (same); Atlas Chartering Serv. v. World Trade Group, 453 F.Supp. 861 (S.D.N.Y.1978) (same); Carolina Power & Light Co. v. Uranex, 451 F.Supp. 1044 (N.D.Ca.1977) (same). But see ITAD Assoc. v. Podar Bros., 636 F.2d 75 (4th Cir. 1981) (following McCreary ). This Court agrees with those courts which have found McCreary's reasoning flawed.

There is no indication that the signatories to the Convention consciously chose the word "refer" to serve as a contradistinction from the FAA's use of the word "stay," or that they were even aware of the FAA. Moreover, "refer" does not necessarily mean that a court has been stripped of all jurisdiction over actions so "referred." Numerous examples exist where matters that have been "referred" remain under the supervision (and hence jurisdiction) of the referring court. Federal district courts, for example, refer a variety of cases and matters to magistrate judges but retain ultimate authority and jurisdiction over them. See 28 U.S.C. § 636(c)(4). To refer a matter therefore does not necessarily strip the court of jurisdiction over the matter or require that the case be erased from its docket. Nor does the Court agree with McCreary's judgment that the granting of provisional remedies undermines the parties' agreement to arbitrate their dispute. A writ of attachment may, in fact, "serve ... as a security device in aid of arbitration." Atlas Chartering Serv. v. World Trade Group, 453 F.Supp. 861, 863 (S.D.N.Y.1978). As Lord

Mustill observed in *The Channel Tunnel Case:*

> The purpose of interim measures of protection, by contrast, is not to encroach on the procedural powers of the arbitrators but to reinforce them, and to render more effective the decision at which the arbitrators will ultimately arrive on the substance of the dispute. Provided that this and no more is what such measures aim to do, there is nothing in them contrary to the spirit of international arbitration.
>
> For similar reasons I am unable to agree with those decisions in the United States (there has been no citation of authority on this point from any other foreign source) which form one side of a division of authority as yet unresolved by the Supreme Court. These decisions are to the effect that interim measures must necessarily be in conflict with the obligations created assumed by the subscribing nations to the New York Convention, because they "bypass the agreed upon method of settling disputes." I prefer the view that when properly used such measures serve to reinforce the agreed method, not to bypass it.

*The Channel Tunnel Case,* [1993] A.C. 334, 365.

■ Apex also argues that the Court lacks jurisdiction to grant a writ of attachment because CIETAC has rules governing such relief. Specifically, Article 23 to CIETAC's arbitration rules provides:

> When a party applies for property preservative measures, the Arbitration Commission shall submit the party's application to the people's court for a ruling in the place where the domicile of the party against whom the property preservative measures are sought is located or in the place where the property of the said party is located.

(Notice of Lodging, Ex. A ¶ 23). Apex submits that the above language indicates that CIETAC has a procedure in place to handle requests for provisional remedies and therefore the Court should abstain from usurping that role. For support, Apex cites the Ninth Circuit's decision in *Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716 (9th Cir.1999).

In *Simula,* the parties agreed to have their disputes handled through arbitration before the Swiss Arbitral Tribunal pursuant to the International Chamber of Commerce ("ICC") Rules of Arbitration. The ICC's arbitration rules granted the Swiss Arbitral Tribunal the authority to "order any interim or conservatory measure it deems appropriate." Because the arbitral tribunal was itself authorized to grant interim relief, the Ninth Circuit held that it would have been inappropriate for the district court to grant such relief. *Id.* at 726.

The same cannot be said of CIETAC's arbitration rules. On their face, CIETAC, when presented with an application for interim relief, can only refer the application to a court. CIETAC's rules are explicit that the arbitration panel cannot itself grant such interim relief. Rather, applications for such relief can only be referred to a "people's court."[5] This fact serves to distinguish the present case from that in *Simula.* There the court noted that it was because the Swiss Arbitral Tribunal could itself grant interim relief that made it inappropriate for the dis-

---

5. The parties disagree as to the meaning of the term "people's court." Apex argues that the term refers solely to a particular type of civil court in China, whereas China National contends that the term embraces both Chinese civil courts and those in foreign countries. In either case, it is clear that the arbitration panel would lack any authority to grant interim relief itself, and thus this case is clearly distinguishable from *Simula.*

trict court to entertain such a request. *Id.* at 726 ("Because ... the ICC arbitral tribunal is authorized to grant the equivalent of an injunction pendente lite, it would have been inappropriate for the district court to grant preliminary injunctive relief.") No similar circumstance exists in this case. Thus, unlike in *Simula,* there is nothing inappropriate with this Court granting such relief.

## B. *APPLICATION FOR WRIT OF ATTACHMENT*

Rule 64 of the Federal Rules of Civil Procedure provides that a federal court applies the law of the state in which it sits. FED. R. CIV. P. 64. Accordingly, California's attachment statute applies to this case.[6]

In California, the procedures and grounds for obtaining orders permitting prejudgment writs of attachment are governed by CAL. CIV. P. CODE § 481.010 *et*

*seq.* Generally, an order of attachment may be issued only in an action for a claim of money which is based upon an express or implied contract where the total amount of such claim is a fixed or "readily ascertainable" amount not less than $500. CAL. CIV. P. CODE § 483.010(a). Neither party disputes that the above requirements have been met with respect to China National's claim.

Before an attachment order is issued, however, the Court must also find all of the following: (1) The claim upon which the attachment is based is one upon which an attachment may be issued; (2) the applicant has established "the probable validity" of the claim upon which the attachment is based; (3) the attachment is not sought for purpose other than the recovery on the claim upon which the request for attachment is based; (4) the amount to be secured by the attachment is greater than zero; and (5) that the award to which the

---

**6.** In its pleadings, China National has made arguments premised on the assumption that California law applies to the contracts in this case. The parties' contracts, however, have no choice of law provision. Arguably, therefore, the law of China, California, or the United Nations Convention on Contracts for the International Sale of Goods ("UNCCISG") could apply. Apex has seized upon this uncertainty to argue that China National is not entitled to a writ of attachment because it cannot demonstrate that its claim has a "probable validity" of success if the law under which that claim would be judged is unclear. Apex's argument, however, is undermined by the fact that during the proceedings in this case it too has argued as if California law would apply to the parties' contracts.

The final blow to Apex's argument is delivered by the Ninth Circuit's decision in *Interpool Ltd. v. Char Yigh Marine (Panama) S.A.,* 890 F.2d 1453 (9th Cir.1989). There the parties fought over whether a right to attach order should have been granted against a Hong Kong cargo ship docked in the port of Los Angeles. In the proceedings below, the trial court relied upon California law to reach

its decision. On appeal, the Hong Kong company that owned the ship argued that Hong Kong law should have been consulted to determine whether the right to attach order should be granted. The Ninth Circuit disagreed, noting: "neither party has offered any evidence of any foreign law or how it would apply to this transaction. Where no authority, or insufficient authority, is presented by the parties about foreign law, a court may conclude that the parties have acquiesced in the application of the law of the forum." *Id.* at 1458. Although Apex has reserved the right to argue that non-California law applies to the parties' contracts in this case, it has nevertheless couched its arguments on whether a writ of attachment should issue using California law. It therefore never presented to this Court how Chinese or the UNCCISG would apply. Understanding the rule in *Interpool Ltd.,* China National did not have to affirmatively demonstrate that California law applied in order to seek a writ of attachment. Rather, in the absence of argument from either party (including demonstrating how foreign law would apply), *Interpool Ltd.* holds that California law is the default rule of law to be applied.

applicant may be entitled may be rendered ineffectual without provisional relief. CAL. CIV. P. CODE § 484.090; § 1281.8(b). As in most attachment applications, the parties have spilled a lot of ink and felled a number of trees over the question of whether China National has demonstrated the probable validity of its claim. Before weighing the parties' arguments, it is important to note what the "probable validity" standard requires from the applicant. Probable validity does not require that the applicant prove that it will in fact win on its claim. Rather, the applicant must only show that it is more likely than not that it will obtain a judgment against the defendant on its claim. CAL. CIV. P. CODE § 481.190.

The outcome of the present dispute hinges on whether Apex rejected the DVD players described in the invoices mentioned above and, if not, whether it later revoked its acceptance of those goods. In either instance, Apex would have been relieved of its duty to pay for the goods thereby negating the probable validity of China National's claim. See CAL. COM. CODE §§ 2602(c), 2608(3).

The delivery of conforming goods is a condition to the buyer's duty to accept and pay for them. See CAL. COM. CODE §§ 2507(1), 2503(1). "[I]f the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may" reject the goods, accept the goods, or accept any commercial units and reject the rest of the goods delivered. CAL. COM. CODE § 2601. There can be little doubt in this case that China National failed to deliver conforming goods. Whether it was loader doors falling off or the failure to play DVD movies or the pause function self-activating, many of the DVD players delivered by China National were more useful as doorstops, or as one creative consumer noted, as boat anchors, than as players of multimedia disks and files. These defects provided Apex with the option to reject the contract or contracts affected by the non-conformities or to reject the particular units containing those defects.

■ Apex claims it did reject the contracts containing the defective goods. Nowhere in its pleadings, however, has Apex articulated how it rejected those goods. Instead, Apex simply states that the delivery of non-conforming goods *by itself* relieved its duty to pay for them. Apex is wrong. When a buyer is presented with non-conforming goods (or learns of the non-conformity of the goods after a reasonable inspection period), it *may* reject the entire contract, accept the entire contract, or accept those goods that do conform and reject the rest. See CAL. COM. CODE §§ 2601(a)-(c); 2606(1)(a). Buyers therefore can accept non-conforming goods. Indeed, if the buyer does nothing after receiving goods it learns are non-conforming, the law deems him to have accepted those goods. See U.C.C. § 2–602 cmt. 1 ("A tender or delivery of goods made pursuant to a contract of sale, even though wholly non-conforming, requires affirmative action by the buyer to avoid acceptance."). The simple fact that the goods are nonconforming does not obviate the need for the buyer to affirmatively reject those goods. See CAL. COM. CODE § 2602(1) ("[Rejection] is ineffective unless the buyer seasonably notifies the seller."). Once the non-conforming goods are accepted, the buyer is under a duty to pay for them. See CAL. COM. CODE § 2607(1). Apex must therefore demonstrate, given that it is the party asserting the defense that the goods' non-conformity relieved it of the duty to pay, that it affirmatively rejected the DVD players.

■ Understanding this, Apex asserts that it rejected the DVD players in ques-

tion by withholding payment for them upon first learning of the defects in the AD–500As and AD–703s. (Opp. at 16–17).[7] This assertion is contradicted by the declarations of Apex's own officers and by its course of conduct upon learning of the defects. Apex did not begin to withhold payment until the end of December, 2000. Apex's engineer, however, testified that he began testing the defective AD–500As and AD–703s towards the end of August, 2000, and initiated correspondence with Shinco's technical personnel regarding these defects as early as September, 2000. (Lo.Decl.¶¶ 14, 16). Moreover, Apex's President testified that he had numerous discussions from October, 2000, onward with China National officials regarding the unacceptable nature of the defects in the AD–500As and AD–703s. (Ji Decl. ¶ 29). Yet despite knowing of these defects Apex continued and, in fact, accelerated the number of DVD players it ordered from China National and then sold to its retail distributors. To the extent one can view Apex's President's expressions of unacceptability as a form of rejection, those words were muted, to the point of ringing hollow, by Apex continuing to order more and more known defective DVD players from China National and by it continuing to sell those assertedly defective DVD players to retail distributors. In order to provide a proper rejection, a party must "take such steps as may be reasonably required to inform the other in ordinary course" that they have rejected the contract. *See* Cal. Com. Code § 1201(26). Certainly continuing to order and then sell those goods you are complaining about would cause a seller to seriously question whether you in fact have rejected the contract. *Cf. CMI Corp. v. Leemar Steel Co.,* 733 F.2d 1410, 1414 (10th Cir.1984) (finding that buyer's comment to seller that it had a "problem" with the goods was not effective as it did not provide a clear and unambiguous rejection).

Courts have also regularly found that under similar circumstances a buyer's actions in continuing to order and sell known defective goods constitutes an acceptance of those goods. In *Streff v. Gold Medal Creamery Co.,* 96 Cal.App. 18, 273 P. 831 (1928), the buyer ordered deliveries of class A milk from the seller over a five month period. The milk delivered by the seller was tainted and did not meet class A requirements. Despite this non-conformity, the buyer continued to order more shipments of milk. At the end of the five-month period, the buyer refused to pay for the last two months worth of deliveries citing the non-conformity of the milk delivered by the seller. The court, however, held that the buyer had accepted the milk with knowledge of the milk's non-conformi-

---

7. During oral argument, Apex made the argument that the true "defects" at issue in this case was the DVD players high rate of customer return, not their mechanical malfunctions. To that end, counsel argued that Apex did not learn of the DVD players' defect until December, 2000, when the customer return rate surpassed the normal return rate of almost 4%. In other words, when the company realized it had a public relations problem. This argument is refuted by Apex's own words. In October 2000, Apex's President was already complaining to China National about the "defects" with the AD–500As and AD–703s. (Ji Decl. ¶ 29). At that time, the return rates for the AD–500As and AD–703s were only .41% and 1.38% respectively, which is significantly less than the normal 4% return rate. (McGowan Decl. Ex. H). It is clear therefore that the "defects" Apex's President was complaining about were the structural and software problems identified earlier. This is buttressed by the fact that when Apex spoke of defects in its February 19, 2001, letter it spoke only with reference to the "various mechanical defects." Given that this is the defect the parties themselves thought was at issue, the Court will not entertain Apex's post-hoc "public relations" defect argument.

ty, and therefore could not assert that non-conformity as a defense. As noted by the court: "The crux of the whole matter is that defendant accepted deliveries of this milk for over five months. During all this time it had knowledge of the fact that the milk did not meet the requirements of their alleged guaranty. Such conduct should and does preclude them from prevailing in their defense which is based upon such guaranty ...." *Id.* at 22, 273 P. 831.

Although the decision in *Streff* pre-dates the adoption of the Uniform Commercial Code ("UCC") in California, the principal embodied in that decision is reflected in section 2-606(1) of the UCC, (adopted as section 2606(1) in the California Commercial Code). That section provides in relevant part:

Acceptance of goods occurs when the buyer

(a) After a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity;

. . . . .

(c) Does any act inconsistent with the seller's ownership ...

CAL. COM. CODE § 2606(1)(a), (c).

Cases interpreting UCC section 2-606 have consistently held that by continuing to order and use the non-conforming goods delivered by the seller, the buyer has accepted the goods despite their nonconformity. *See U.S. Roofing, Inc. v. Credit Alliance Corp.*, 228 Cal.App.3d 1431, 1443–44, 279 Cal.Rptr. 533 (1991) (looking to decisions from other jurisdictions interpreting the UCC to interpret California's Commercial Code). For example, the court in *Lorenzo Banfi di Banfi Renzo & Co. v. Davis Congress Shops, Inc.*, 568 F.Supp. 432 (N.D.Ill.1983) found that a buyer had accepted nonconforming shoes when, with knowledge of the defect, it placed the shoes in its inventory, offered them for sale, and, in fact, had sold half of them by the time suit was filed. In *Meland v. Intermountain Sys., Inc.*, 219 Mont. 242, 712 P.2d 1295 (1985), a builder ordered a metal curvette building kit from a supplier. The contract explicitly required that the kit be such that it could be used to construct an 18 foot high building. Ten days after delivery of the kit, the builder began assembling the building and discovered that the kit could only construct a building 16½ feet high. The builder contacted the supplier and notified him of the defect, but went ahead and used components in the kit to construct the building he desired. The court held that by continuing to use the non-conforming goods after discovering the defect, the builder had accepted the goods. *Id.* at 1297. As one treatise illustrated by way of a hypothetical:

Assume, for example, that buyer purchases 1400 feet of cast iron pipe. On the day after the purchase the buyer discovers that the sections of pipe are not of uniform length. Thereafter buyer makes a contract to resell the pipe, and still later—after the resale contract has fallen through for other reasons—the buyer attempts to reject. Without more, we think the attempt to resell at a time buyer was aware of the alleged defect in the goods is an act inconsistent with the seller's ownership and an acceptance.

1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 8–2 (4th ed. 1995) ("WHITE & SUMMERS").

Here Apex's actions in continuing to market the defective DVD players it had received from China National and ordering even more of them for months after it learned of the defects constitutes an accep-

tance of the goods, be it under section 2606(1)(a) or 2606(1)(c). The Court is sympathetic to the fact that Apex spent some of this time attempting to work out the bugs with the AD–500s and AD–703s, but spending four months to do so crosses the line between a permissible opportunity to correct before rejecting the goods to one of accepting those goods despite their non-conformity. *See In re Alloy Metal Wire Works, Inc.*, 52 B.R. 39 (Bankr. E.D.Pa.1985) (holding that buyer accepted defective wire after it spent 60 man hours and a large portion of wire in an attempt to produce serviceable screw blanks).

As if that was not enough, the Court also notes that the parties themselves agreed to the form any rejection of goods would have to take in order to be effective. *Cf.* U.C.C. § 2–602 cmt. 1 ("Contract provisions limiting the time for rejection fall within the rule of the section on 'Time' and are effective if the time set gives the buyer a reasonable time for discovery of defects."). To reject the DVD players on account of any quality defect, Apex was required to lodge a claim with China National supported by a survey report issued by an inspection organization agreed to by the parties within 30 days of the delivery of the defective goods. (Ji Decl. Ex. C ¶ 13). Nowhere in any of the declarations or pleadings filed with this Court has Apex demonstrated, much less articulated, that it adhered to any of the above-listed requirements. In the absence of such proof, Apex is precluded by the contracts it signed from asserting a defense of rejection.

■ That it is more than likely that Apex accepted the defective DVD players does not end the analysis. Apex has also claimed that it later revoked its acceptance of the DVD players. Once Apex accepted the DVD players with knowledge of their defects, it was precluded from later revoking its acceptance based on those defects unless: (1) it can show that the defects substantially impaired the value of the contract to Apex; (2) its "acceptance was on the reasonable assumption that the nonconformity would be seasonably cured;" (3) it revoked its acceptance within a reasonable time after discovering the defect; (4) the revocation occurred before any substantial change occurred to condition of the DVD players; and (5) it provided due notice of its revocation to China National. *See* CAL. COM. CODE § 2607. Apex's conduct in this case fails to meet a number of these requirements.

The fact that Apex resold these defective DVD players to retail distributors seriously places in doubt any argument that the goods have not undergone a substantial change in condition. *See Eaton Corp. v. Magnavox Co.*, 581 F.Supp. 1514, 1529 (E.D.Mich.1984) (buyer's sale of goods to its customers constituted a substantial change in condition of the goods precluding later attempted revocation). Moreover, whether it be Mr. Ji's statements to China National that the DVD players were "unacceptable" and that Apex considered China National in breach, or the February 19, 2001, letter from Mr. Hsu protesting the "significantly higher than normal return rate[s]" and how those return rates had injured its business relationship with Circuit City, Apex never gave a proper notice of revocation to China National. *See International Commodities Exp. Corp. v. North Pacific Lumber*, 764 F.Supp. 608 (D.Or.1991) (holding that mere notification of breach is not sufficient notice of revocation in an action between merchants). In "cases between merchants … the essential content of the notice must set forth 'the nonconformity in the goods materially impairing their value to the buyer.' The content must also inform the seller that the buyer does not wish to keep the goods.

If the buyer equivocates in word or in deed, its purported revocation may be invalid." WHITE & SUMMERS § 8–4 (4th ed.1995). Nowhere in its discussions with China National did Apex state that it did not wish to keep the goods delivered to it. Indeed, Apex, in fact, continued to sell the defective DVD players *after* these communications with China National. Thus, serious doubts exist as to whether Apex provided a valid notice of revocation in this case. Finally, although Apex has put forward evidence demonstrating that its technical personnel discussed ways to correct the defects, nowhere has Apex, either by declaration or factual representation in its pleadings, argued that it continued to order shipment of the DVD players upon the assumption that China National would be able to cure the defect. Without such a showing, Apex's acceptance of the defective DVD players does not fall within the safe harbor provided by section 2607(2).

 As a final note, the Court observes that both parties agree that Apex should receive a reduction in the writ of attachment amount for the value, as determined by the contract price, of the DVD players it has already returned to China National. (Compl. ¶ 13; Opp. at 24). Apex, however, also seeks a reduction in the attachment amount for the 4,600 AD–703s currently stored in its warehouse that it "intends" to return to China National and also for the amount of DVD players it "anticipates" customers will return over the coming months. Given Apex's proclivity to sell DVD players it intends to return, and given the speculative nature of Apex's projections on how many DVD players customers will in fact return in the future, the Court denies Apex's request for a further reduction in the attachment amount. Should Apex sometime in the future actually return the above-mentioned DVD players or its anticipated customer returns materialize, it can return to this Court and apply for a reduction in the attachment amount. *See* CAL. CIV. P. CODE § 485.240.[8]

Given these authorities, the Court concludes that under California law it would be more likely than not that Apex accepted the DVD players shipped under the invoices in question and, except for those returned to China National, did not revoke its acceptance. Therefore, China National

---

**8.** Apex has also contended that it should receive an offset in the amount of $1,007,884 for patent royalties China National failed to pay to MPEG LA and for which MPEG LA could seek from Apex or its retail distributors. (Hsu Decl. ¶¶ 29–32). Mr. Hsu's declaration, however, posits the possibility that China National may still pay these royalties (and hence relieve Apex of any liability to MPEG LA) and also notes that MPEG LA's threats have yet to materialize into a concrete liability for Apex. In other words, MPEG LA has not yet initiated suit against Apex or any of its retail distributors for the sale of unlicensed DVD players. Indeed, there is nothing to prevent MPEG LA to sue China National *directly* for the failure to pay such licensing fees rather than Apex. For the same reasons that Apex is not at this moment in time entitled to an offset for unrealized anticipated customer returns, so too it cannot receive an offset for

any unpaid MPEG LA royalties. If at some point in the future MPEG LA sues Apex or one of its retail distributors (for which an indemnification agreement exists), then Apex can apply to this Court for a reduction in the writ of attachment amount. Until the occurrence of such an event, any discussion concerning Apex's liability for unpaid royalties is nothing but pure speculation.

Apex has also sought an offset in the amount of about $3,000,000 for what it claims is the "value" of China National's pre-existing security interest in some of its property. *See* CAL. CIV. P. CODE § 483.015(b)(4). The parties, however, have not briefed this issue. Until specific arguments are lodged with the Court concerning whether China National has such a preexisting security interest and what is the value of that interest, a reduction in the attachment amount is not warranted.

has demonstrated that its claim has a probable validity of success.

██ This leaves the final requirement required by California law for a writ of attachment to issue: Proof that any award China National receives in the arbitration before CIETAC "may be rendered ineffectual" absent a writ of attachment. *See* CAL. CIV. P. CODE § 1281.8(b). China National has met this requirement. There is evidence demonstrating Apex's inability or unwillingness to pay its outstanding debts, suggesting a problem with the company's finances. Apex has also been threatened by some of its customers, most notably Circuit City, with claims for indemnification totaling in the millions of dollars. Finally, there is the statement from Apex's President, later denied, that the company was having financial difficulties making it difficult for Apex to meet its payments. Given these circumstances, the Court concludes that a basis exist to believe that any arbitral award by CIETAC in favor of China National "may be" rendered ineffectual by the subsequent deterioration in the financial condition of Apex during the arbitration proceedings.

Having met all the requirements for a writ of attachment to issue, the Court hereby **GRANTS** China National's Application for a Writ of Attachment, pursuant to CAL. CIV. P. CODE § 489.210, against Apex in the amount of $ 18,975,059 (representing the amount of the outstanding invoices minus the contract value of the DVD players Apex has returned to China National).

IT IS SO ORDERED.